

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

August 29, 1951

Hon. D. K. Woodward, Jr., Chairman
Board of Regents
The University of Texas
Austin, Texas

Opinion No. V- 1263

Re: Oath requirement for Uni-
versity of Texas employees
in view of the "Non-Subver-
sive Oath" provision of the
general appropriation bill.

Dear Sir:

Your request for an opinion is in part as follows:

"I respectfully request your opinion on the ques-
tion of the proper procedure to be followed by The
University of Texas in complying with the statutory
provisions requiring the execution of loyalty oaths by
its employees. There are three statutes on this sub-
ject:

"(1) Article 2908a, Vernon's Texas Civil Stat-
utes (Acts 1941-47th Leg., p. 1355, ch. 617) requires
the execution of the Constitutional oath required to be
taken by members of the Legislature and all other of-
ficers.

"(2) Article 2908b, Vernon's Texas Civil Stat-
utes (Acts 1949, 51st Leg., p. 1368, ch. 621) requires
the execution of an oath to the effect, among other
things, that the affiant does not believe in the over-
throw of the government by violence or other unlaw-
ful means and that the affiant is not and has not been
during the past two years a member of a society or
group advocating such overthrow.

"(3) Section 1 of Article VI, entitled "General
Provisions", of House Bill No. 426 (the general ap-
propriation bill) passed by the 52nd Legislature re-
quires the execution of an oath to the effect, among
other things, that the affiant has not been during the
past ten years a member of any organization listed by
the Attorney General of the United States in 1947 as
being subversive.

"  . . . .

"In order that The University of Texas may follow the correct procedure in making contracts with its employees and in paying their compensation, we respectfully ask your opinion and advice as to which of the above mentioned oaths should be required of our employees.

"The question has been raised because of the fact that the Legislature has dealt with the matter as a subject of general legislation in Articles 2908a and 2908b, and the Constitution of Texas has been interpreted in similar cases so as to prohibit the amendment, change, or enactment of general legislation in an appropriation bill. It presents the problem of whether the rider in the appropriation bill is constitutional, and if so, whether the loyalty oath therein required shall be substituted for the oath required by Article 2908a or Article 2908b or whether any two or all three of these oaths must be executed by employees of the state-supported institutions of higher learning."

Article 2908a, V.C.S. (Acts of the 47th Leg., R.S. 1941, ch. 617, p. 1355) was passed in 1941 and required an oath of allegiance by teachers, instructors and employees of all tax-supported institutions of learning in Texas. This oath has the same wording as the constitutional oath required of all State officers. The oath reads:

"I, _____, do solemnly swear (or affirm), that I will faithfully execute the duties of the office of _____ of the State of Texas, and will to the best of my ability preserve, protect, and defend the Constitution and laws of the United States and of this State; and I furthermore solemnly swear (or affirm), that I have not directly nor indirectly paid, offered, or promised to pay, contributed, nor promised to contribute any money, or valuable thing, or promised any public office or employment, as a reward for the giving or withholding a vote at the election at which I was elected. So help me God." Article XVI, Section 1, Texas Constitution.

In 1941 the Legislature enacted Article 2908b, V.C.S. (Acts of the 51st Leg., 1949, ch. 621, p. 1368), which applies to students as well as employees of all State-supported universities and colleges. This statute requires the following oath:

"I swear or affirm that I believe in and approve the Constitution of the United States and the principles of government therein contained, and will not in any manner aid or assist in any effort or movement to subvert or destroy the government of the United States or of any State or of any political subdivision thereof by force, violence, or any other unlawful means. In the event of war with any foreign nation, I will not support or adhere to the government of such foreign nation

"I swear or affirm that I am not and have not during the past two (2) years been a member of or affiliated with any society or group of persons which teaches or advocates that the government of the United States or of any State or of any political subdivision thereof should be overthrown or destroyed by force, violence, or any other unlawful means, or the adherence to the government of any foreign nation in the event of war between the United States and such foreign nation."

No person is to be admitted or employed by any of these institutions until he has taken the oath. Provisions are made for a hearing and appeal for any person accused and found guilty of violating the oath. To our best knowledge, the requirements of these statutes have been fully complied with in all respects since their passage, and you indicate in your request that they are being complied with at The University of Texas.

The Fifty-second Legislature attached a rider in the general appropriation bill (House Bill No. 426, Acts 52nd Leg., R.S. 1951, ch. 499, p. 1228) which provides:

"Sec 1. No money appropriated by this Act shall be paid to any person as salary or as compensation for personal services unless and until such person has filed with the payroll clerk or official by whom such salary or other compensation is certified for payment, an oath or affirmation stating:

"(a) That the affiant is not, and has never been, a member of the Communist Party. (The term 'Communist Party' as used herein means any organization which (a) is substantially directed, dominated or controlled by the Union of Soviet Socialistic Republics or its satellites, or which (b) seeks to overthrow the Government of the United States or of any State by force, violence or any other unlawful means); and

"(b) That the affiant is not, and for a period of at least ten (10) years has not been, a member of any organization, association, movement, group or combination which the Attorney General of the United States, acting pursuant to Executive Order No. 9835, March 21, 1947, 12 Federal Register 1935, has designated as totalitarian, fascist, communist or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of Government of the United States by unconstitutional means; and

"(c) That the affiant is not, and for a period of at least ten (10) years has not been, a member of any 'Communist Political Organization' or 'Communist Front Organization' registered under the Federal Internal Security Act of 1950 (50 U.S.C.A. 781, et seq.) or required to so register under said Act by final order of the Federal Subversive Activities Control Board."

"Sec. 2. The various agencies, departments, boards and institutions for which appropriations are made in this Act shall obtain and make available to their employees, the names of organizations, associations, movements, groups and combinations comprehended by subdivisions (b) and (c) above in order that such employees can readily perceive whether they can lawfully and truthfully file the oath or affirmation required herein." Article VI, p. 1447.

Based upon these facts and summarizing your request, the following is the question presented for our consideration: Is the "Non-Subversive Oath" required by Article VI of the General Provisions of House Bill No. 426, Fifty-second Legislature, R.S. 1951, ch. 499, p. 1228, constitutional, and, if so, does it supersede either or both of the oaths required by Articles 2908a and 2908b, V.C.S.?

The most serious problem which must be considered in answering your question is whether legislation such as the rider prescribing the "Non-Subversive Oath" can be constitutionally included in a general appropriation bill. If the above-quoted language were included in a general statute the problem presented would be far less difficult. The Legislature may enact many provisions of law in a general statute which it cannot include in a general appropriation bill. The primary constitutional limitation upon the subject matter of riders in a general appropriation bill is Section 35

of Article III of the Texas Constitution, which provides:

"No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof, as shall not be so expressed."

The courts of this State and many opinions of the Attorney General have held that under this constitutional provision general legislation cannot be contained in a general appropriation bill. The rule in this regard is set out in Attorney General's Opinion No. V-1254 (1951) as follows:

"As long as a general appropriation bill includes only subjects of appropriating money and limiting the use thereof in harmony with general legislation, it may relate to any number of different 'subjects and accounts.' In such instances all of the subjects are under the one general object and purpose of appropriating funds from the treasury. The obvious purpose of this limited exception was to make certain that appropriations to more than one department in the same bill would not be prohibited. In all other respects general appropriation bills are subject to the same prohibition as all other bills against containing more than one subject. The result is that general legislation cannot be embodied within a general appropriation bill. Moore v Sheppard, supra.

"A general appropriation bill may be defined as a single bill which appropriates funds for two or more departments, subjects, accounts, or purposes. It has the one general purpose or subject matter of appropriating money.

"General legislation does more than appropriate money and limit its expenditure. As said by a former Attorney General in Opinion No. 2965 (1935),

" ' . . . if the Bill does more than set aside a sum of money, provide the means of its distribution, and to whom it shall be distributed, then it is a general law . . . '

"Thus, the distinction between general appropriation bills and general legislation has been recognized

in this State in the simple fact that the former mere-
ly sets apart sums of money for specific objects and
uses while the latter does more than merely appro-
priate and limit the use of funds. General legislation
constitutes a separate subject and cannot be included
within a general appropriation bill. Moore v. Shep-
pard, supra; Att'y Gen. Op. 2965, supra.

"This does not mean that general legislation may
not contain an appropriation which is merely incidental
to and necessary to carry out the subject and purpose
of the general law. Attorney General's Opinion No.
2965, supra. Neither does it mean that a general ap-
propriation bill may not contain general provisions and
details limiting and restricting the use of the funds
therein appropriated, if such provisions are necessar-
ily connected with and incidental to the appropriation
and use of the funds and if they do not conflict with or
amount to general legislation. Conley v. Daughters of
the Republic, 106 Tex. 80, 156 S.W. 197 (1913)."

The same opinion states a general rule with reference
to matters that may be included in a general appropriation bill as
follows:

"With special regard to what incidental provi-
sions may be included within a general appropriation
bill, our Texas courts have not stated a general rule.
However, from statements as to what may not be in-
cluded and from numerous opinions of the Attorney
General, we believe the rule may be stated generally
as follows: In addition to appropriating money and
stipulating the amount, manner, and purpose of the
various items of expenditure, a general appropriation
bill may contain any provisions or riders which detail,
limit, or restrict the use of the funds or otherwise in-
sure that the money is spent for the required activity
for which it is therein appropriated, if the provisions
or riders are necessarily connected with and incidental
to the appropriation and use of the funds, and provided
they do not conflict with general legislation."

The legal and historical background of these rules is
set forth in detail in Opinion No. V-1254, supra, a copy of which is
attached for your information. The only way any part of the rider
here in question can be upheld is under the general rule last quoted
above. Any part of the rider which does not come within that rule
is invalid.

If the "Non-Subversive Oath" rider applied only to State employees who are present members of the subversive organizations included in the rider or those who become members thereof in the future, we believe the rider would come within the above-mentioned rule for insuring that the money is spent for the required activity for which it is therein appropriated. This is true for the reason that the doctrine and teachings of those organizations is the very antithesis of the normal operation of State government and the proper fulfillment of the duties assigned to a State employee, hence payment to members thereof would result in partial failure of the appropriation.

It has been held that no unit of government can be denied the right to keep out of its employ those who seek to overthrow the government by force or violence, or those who are knowingly members of an organization engaged in such endeavor. Garner v. Board of Public Works, 71 S.Ct. 909 (1951). That the Communist Party and those organizations which are described as "Communist Fronts" come within the proscribed group is clear. As stated by Mr. Justice Jackson in his concurring opinion in United States v. Dennis, 71 S.Ct. 857, 894 (1951):

"... From time to time it [Communism] champions all manner of causes and grievances and makes alliances that may add to its foothold in government or embarrass the authorities.

"The Communist Party, nevertheless, does not seek its strength primarily in numbers. ... It seeks members that are, or may be, secreted in strategic posts in transportation, communications, industry, government, and especially in labor unions where it can compel employers to accept and retain its members. It also seeks to infiltrate and control organizations of professional and other groups. Through these placements in positions of power it seeks a leverage over society that will make up in power of coercion what it lacks in power of persuasion.

"....

"The United States, fortunately has experienced Communism only in its preparatory stages and for its pattern of final action must look abroad ... Communist technique in the overturn of a free government was disclosed by the coup d'etat in which they seized power in Czechoslovakia. There the Communist Party during its preparatory stage claimed and received protection for its freedoms of speech, press, and assembly. Pretending to be but another political party, it eventually

was conceded participation in government, where it
entrenched reliable members chiefly in control of
police and information services. When the govern-
ment faced a foreign and domestic crisis, the Com-
munist Party had established a leverage strong enough
to threaten civil war. In a period of confusion the
Communist plan unfolded and the underground organ-
ization came to the surface throughout the country in
the form chiefly of labor 'action committees.' Com-
munist officers of the unions took over transportation
and allowed only persons with party permits to travel.
Communist printers took over the newspapers and
radio and put out only party-approved versions of
events. Possession was taken of telegraph and tele-
phone systems and communications were cut off
wherever directed by party heads. Communist unions
took over the factories, and in the cities a partisan
distribution of food was managed by the Communist
organization. A virtually bloodless abdication by the
elected government admitted the Communists to pow-
er, whereupon they instituted a reign of oppression
and terror, and ruthlessly denied to all others the
freedoms which had sheltered their conspiracy."
(Emphases added throughout.)

A most important and fundamental step in the seizing
control of existing government by subversives is the creation of
dissatisfaction among the loyal citizenry with government in its
present democratic form. This attempt to create dissatisfaction,
of necessity and by design, extends to all levels from the highest
governmental position to the lowest. Infiltration and the subse-
quent performance of assigned duties in an unsatisfactory manner
is a most logical way to extend the idea that present government
is inefficient and should be replaced. This weakening process is
one of the things which democracy must guard against in order to
follow the most fundamental principles of self-preservation. It is
also commonly known that subversives spend on-duty and off-duty
time in all vocations working for, planning, and spreading their
political beliefs and tearing down democratic principles and pro-
cedures. It is thus reasonable for the Legislature to have made
the determination that those persons who are members of subver-
sive organizations would not properly fulfill the duties for which
they would be paid out of funds appropriated in House Bill 426.
Indeed, it is most reasonable to assume that there would be a fail-
ure of performance, and that the purpose of the appropriation would
be defeated in whole or in part.

Viewed in this light Section 1 of Article VI of House
Bill 426 is very closely analogous to the rider prohibiting the use

of appropriated funds "for the payment of salaries to any employee who uses alcoholic beverages while on active duty." Subdiv. (23), Sec. 2, Art. III, H.B. 426, supra, at p. 1441. This rider was recently upheld as "insuring that the purpose of the appropriation will not be defeated and the money wasted on an employee who carries on unauthorized activities during the time for which he is being paid to attend to the State's business." Att'y Gen. Op. No. V-1254 (1951).

Another rider which was upheld on the same basis is that prohibiting payment of appropriated funds to an employee who engages in certain political activities. Subdiv. (11), Sec. 2, Art. III, H.B. 426, supra, at p. 1434. In placing the political activities rider in the general appropriation bill the Legislature has very clearly determined that no employee while on duty for the State should engage in affairs tending toward the selection of persons to occupy elective offices and thus neglect or fail to perform the official duties for which he is being paid from appropriated funds. These prohibited activities would undoubtedly lead to a failure of the appropriation due to the impossibility of properly carrying on two functions at the same time. In placing the "Non-Subversive Oath" rider in the general appropriation bill the Legislature made the same determination with reference to those engaging in subversive activities. Subversives necessarily engage in activities political in nature, as well as other activities tending toward the eventual overthrow of the State government. The two riders having been placed in the general appropriation bill for the same purpose and the one held a valid inclusion, the other must also be valid.

As was stated by the Supreme Court of the United States in Garner v. Board of Public Works, supra, with regard to an oath similar in many respects to that prescribed by Section 1 of Article VI:

"... Likewise, as a regulation of political activity of municipal employees, the amendment was reasonably designed to protect the integrity and competency of the service. This Court has held that Congress may reasonably restrict the political activity of federal civil service employees for such a purpose, United Public Workers v. Mitchell, 1947, 330 U.S. 75, 102-103, 67 S. Ct. 556, 570, 571, 91 L.Ed. 754, and a State is not without power to do as much."

What has been said with regard to that part of the rider prohibiting payment of funds therein appropriated to present or future members of subversive organizations does not apply to the rider in its entirety. That portion concerning itself with the expenditure of appropriated funds for the payment of salaries to those who once belonged to a listed organization and who are now no longer spending

time in the conflicting and subversive activities contains subject matter of general legislation. It is one thing to prohibit payment of funds to persons now belonging to subversive organizations and quite a different thing to prohibit payment and thereby deny State employment to those who once belonged but later renounced and do not now belong to such an organization.

A mere glance at the names of over 100 organizations on the Attorney General's present subversive list will reveal that perfectly loyal citizens could have been induced to join some of them without knowledge of their evil purposes. Such a person who innocently joined one of these organizations 7 years ago but re-signed and denounced it upon discovery of its subversive purpose 6 years ago would nevertheless be prevented from receiving a State salary today under the 10 year retroactive feature of the rider. This amounts to setting up a general qualification for State employees based upon what they belonged to and what their activities were in the past rather than upon what they belong to, and do at the present or in the future. Such general legislation may be proper and desirable, but if so, it must be enacted in a general statute in order to be constitutional. This type of legislation has been held to be a punishment for past activities, United States v. Lovett, 328 U.S. 303 (1946), Bailey v. Richardson, 182 F.2d 46 (Ct. of App. D.C. 1950) aff'd per curiam by a divided court 71 S.Ct. 669 (1951), and there can be no doubt but that provisions for pun-ishment of this nature must be contained in general legislation rather than a general appropriation bill. Even in drafting a gen-eral law with retrospective provisions great care must be taken to prevent a conflict with Section 16 of Article I of the Texas Con-stitution and Section 10 of Article I of the United States Constitu-tion prohibiting the passage of bills of attainder or ex post facto laws. Cummings v. Missouri, 71 U.S. 277 (1866); Fletcher v. Peck, 6 Cranch 87 (1810); United States v. Lovett, supra; Garner v. Board of Public Works, supra; Bailey v. Richardson, supra.

The difference between what the Legislature may in-corporate in a general appropriation bill and what it may not con-stitutionally incorporate therein is clearly illustrated by the pros-pective and retrospective features of the rider under consideration. The retrospective provision attempts to do more than insure "that the purpose of the appropriation will not be defeated and the money wasted on an employee who carries on unauthorized activities dur-ing the time for which he is being paid to attend to the State's busi-ness." It is based on past activities of employees and not present activities which are certain to conflict with the purpose of the ap-propriation. On the other hand, present membership in an organ-ization bent on overthrowing or undermining the State government has substantial effect upon an employee's productivity at his job. As such, the prospective feature is not an attempt to incorporate

general legislation in a general appropriation bill, but is only an attempt by the Legislature to insure that the money appropriated is spent for the designated purpose. The distinction between the prospective and retrospective features of the rider with regard to ability or willingness to perform present or future duties is apparent. Upon this distinction rests the difference in the legal principles to be applied.

With the foregoing in mind, a final answer to your question involves several general and well-settled legal principles. It is well settled that in determining the constitutionality of a statute it is the duty of the courts to uphold the legislative enactment if at all possible and to adopt any reasonable construction which will place the statute in harmony with the Constitution rather than one which will cause the statute to be in violation thereof. Pickle v. Finley, 91 Tex. 484, 44 S.W. 480 (1898) and Greene v. Robison, 117 Tex. 516, 82.S.W.2d 655 (1928). This same duty applies with equal force to the Attorney General.

Similarly, it is incumbent upon us, by direct legislative mandate, should a portion of Section 1 of Article VI of House Bill No. 426 be in violation of the Constitution under any reasonable construction, to uphold any portion thereof which is constitutional. Article VII of House Bill 426, a "saving clause," provides:

"If any section, sentence, or clause or part of this Act shall for any reason be held to be invalid, such decision shall not affect the remaining portions of this Act, and it is hereby declared to be the intention of the Legislature to have passed each sentence, section, clause or part thereof, irrespective of the fact that any other sentence, section, clause, or part thereof may be declared invalid."

The language of the rider leaves no doubt that the Legislature was of the opinion that any person belonging to one of the named organizations is unable to carry out his assigned duties, thereby causing a failure of the appropriation in part. That this is a reasonable assumption is borne out by United States v. Dennis, supra, and the previous discussion in this opinion. Thus the Legislature attempted to insure that appropriated funds would not be paid to one whose purpose is to undermine and destroy the State government by failing to perform or improperly performing his assigned duties. In our opinion the rider, in so far as it requires an oath of no present or future membership in the subversive organizations, is valid. Under the saving clause this valid portion of the rider is severable from that portion which is the subject of general legislation attempted in a general appropriation bill and hence unconstitutional under Section 35 of Article III of the Texas Constitution.

The effect of the "Non-Subversive Oath" rider as herein construed is to require that every State employee execute the oath required by this rider, which, to comply with the constitutional requirements, should read as follows:

"(a) That the affiant is not a member of the Communist Party. (The term 'Communist Party' as used herein means any organization which (a) is substantially directed, dominated or controlled by the Union of Soviet Socialistic Republics or its satellites, or which (b) seeks to overthrow the Government of the United States or of any State by force, violence or any other unlawful means; and

"(b) That the affiant is not a member of any organization, association, movement, group or combination which the Attorney General of the United States, acting pursuant to Executive Order No. 9835, March 21, 1947, 12 Federal Register 1935, has designated as totalitarian, fascist, communist or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of Government of the United States by unconstitutional means; and

"(c) That the affiant is not a member of any 'Communist Political Organization' or 'Communist Front Organization' registered under the Federal Internal Security Act of 1950 (50 U.S.C.A. 781, et seq.) or required to so register under said Act by final order of the Federal Subversive Activities Control Board."

After receiving the list of subversive organizations listed by the Attorney General of the United States which serves as notice that those organizations listed are subversive, each employee must sign the oath prior to receiving his salary.

We are not unmindful of the rule of law that a general appropriation bill may not alter, amend or repeal general law. Att'y Gen. Op. V-1254, supra. The constitutional portion of the rider in question does not violate this rule but is merely cumulative of statutes requiring execution and filing of oaths. It is in complete harmony with the general statutes on the subject. Conley v. Daughters of the Republic, 106 Tex. 80, 156 S.W. 197 (1913). Turning, then, to the procedure to be followed at The University of Texas, since the oaths required at State-supported institutions of higher learning are cumulative and each an additional safeguard against the employment of subversives, all three of the oaths must

be executed. In this connection we know of no reason why they should not be joined in one document and subscribed and sworn to as a single instrument.

## SUMMARY

The "Non-Subversive Oath" required by the general appropriation bill for the biennium ending August 31, 1953 (Art. VI, Sec. 1, H.B. 426, Acts 52nd Leg., R.S. 1951, ch. 499, p. 1228), is constitutional and cumulative of the existing oaths to the extent that its operation is prospective. The rider to this extent is a mere limitation upon the use of the money and insures that the money will be spent for the required activity for which it was appropriated.

It is commonly known that Communists and other subversives spend on-duty and off-duty time in all vocations working for, planning, and spreading their political beliefs and tearing down democratic principles and procedures. It is therefore a reasonable limitation, restriction, and safeguard on the expenditure of public funds for the Legislature to provide that funds therein appropriated for salaries shall not be paid to employees who belong to subversive organizations. Since it is incidental to the appropriation and is not an additional subject of general legislation, this provision does not violate Sec. 35, Art. III of the Texas Constitution.

That portion of the rider which is retrospective rather than prospective in operation is a subject matter of general legislation and therefore invalid in a general appropriation bill. However, the two portions are severable, and under the valid portion each State employee must execute an oath that he is not a member of the Communist Party or any other subversive organization referred to in the rider before receiving a salary from money appropriated by House Bill 426.

Yours very truly,

Price Daniel
Attorney General

E. Jacobson
E. Jacobson

E. Wayne Thode
E. Wayne Thode
Assistants

EJ:wb:mwb