# GARNER et al. v. BOARD OF PUBLIC WORKS OF LOS ANGELES et al.

No. 453.   Argued April 25, 1951.—Decided June 4, 1951.

*Charles J. Katz* and *Samuel Rosenwein* argued the cause for petitioners. With them on the brief was *John T. McTernan.*

*Alan G. Campbell* argued the cause for respondents. With him on the brief were *Ray L. Chesebro, Bourke Jones* and *A. L. Lawson.*

*A. L. Wirin, Fred Okrand, Loren Miller* and *Clore Warne* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

In 1941 the California Legislature amended the Charter of the City of Los Angeles to provide in part as follows:

". . . no person shall hold or retain or be eligible for any public office or employment in the service

718

of the City of Los Angeles, in any office or department thereof, either elective or appointive, who has within five (5) years prior to the effective date of this section advised, advocated or taught, or who may, after this section becomes effective [April 28, 1941], advise, advocate or teach, or who is now or has been within five (5) years prior to the effective date of this section, or who may, after this section becomes effective, become a member of or affiliated with any group, society, association, organization or party which advises, advocates or teaches, or has, within said period of five (5) years, advised, advocated or taught the overthrow by force or violence of the government of the United States of America or of the State of California.

"In so far as this section may be held by any court of competent jurisdiction not to be self-executing, the City Council is hereby given power and authority to adopt appropriate legislation for the purpose of effectuating the objects hereof." Cal. Stat. 1941, c. 67.

Pursuant to the authority thus conferred, the City of Los Angeles in 1948 passed Ordinance No. 94,004, requiring every person who held an office or position in the service of the city to take an oath prior to January 6, 1949. In relevant part the oath was as follows:

"I further swear (or affirm) that I do not advise, advocate or teach, and have not within the period beginning five (5) years prior to the effective date of the ordinance requiring the making of this oath or affirmation, advised, advocated or taught, the overthrow by force, violence or other unlawful means, of the Government of the United States of America or of the State of California and that I am not now and have not, within said period, been or become a mem-

ber of or affiliated with any group, society, association, organization or party which advises, advocates or teaches, or has, within said period, advised, advocated or taught, the overthrow by force, violence or other unlawful means of the Government of the United States of America, or of the State of California. I further swear (or affirm) that I will not, while I am in the service of the City of Los Angeles, advise, advocate or teach, or be or become a member of or affiliated with any group, association, society, organization or party which advises, advocates or teaches, or has within said period, advised, advocated or taught, the overthrow by force, violence or other unlawful means, of the Government of the United States of America or of the State of California . . . ."

The ordinance also required every employee to execute an affidavit "stating whether or not he is or ever was a member of the Communist Party of the United States of America or of the Communist Political Association, and if he is or was such a member, stating the dates when he became, and the periods during which he was, such a member . . . ."

On the final date for filing of the oath and affidavit petitioners were civil service employees of the City of Los Angeles. Petitioners Pacifico and Schwartz took the oath but refused to execute the affidavit. The remaining fifteen petitioners refused to do either. All were discharged for such cause, after administrative hearing, as of January 6, 1949. In this action they sue for reinstatement and unpaid salaries. The District Court of Appeal denied relief. 98 Cal. App. 2d 493, 220 P. 2d 958 (1950). We granted certiorari, 340 U. S. 941 (1951).

Petitioners attack the ordinance as violative of the provision of Art. I, § 10 of the Federal Constitution that "No State shall . . . pass any Bill of Attainder, [or] ex post facto Law . . . ." They also contend that the ordinance

deprives them of freedom of speech and assembly and of the right to petition for redress of grievances.

Petitioners have assumed that the oath and affidavit provisions of the ordinance present similar constitutional considerations and stand or fall together. We think, however, that separate disposition is indicated.

1. The affidavit raises the issue whether the City of Los Angeles is constitutionally forbidden to require that its employees disclose their past or present membership in the Communist Party or the Communist Political Association. Not before us is the question whether the city may determine that an employee's disclosure of such political affiliation justifies his discharge.

We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment. The affidavit requirement is valid.

2. In our view the validity of the oath turns upon the nature of the Charter amendment (1941) and the relation of the ordinance (1948) to this amendment. Immaterial here is any opinion we might have as to the Charter provision insofar as it purported to apply retrospectively for a five-year period prior to its effective date. We assume that under the Federal Constitution the Charter amendment is valid to the extent that it bars from the city's public service persons who, subsequent to its adoption in 1941, advise, advocate, or teach the violent overthrow of the Government or who are or become affiliated with any group doing so. The provisions operating thus prospectively were a reasonable regulation

to protect the municipal service by establishing an employment qualification of loyalty to the State and the United States. Cf. *Gerende* v. *Board of Supervisors of Elections,* 341 U. S. 56 (1951). Likewise, as a regulation of political activity of municipal employees, the amendment was reasonably designed to protect the integrity and competency of the service. This Court has held that Congress may reasonably restrict the political activity of federal civil service employees for such a purpose, *United Public Workers* v. *Mitchell,* 330 U. S. 75, 102–103 (1947), and a State is not without power to do as much.

The Charter amendment defined standards of eligibility for employees and specifically denied city employment to those persons who thereafter should not comply with these standards. While the amendment deprived no one of employment with or without trial, yet from its effective date it terminated any privilege to work for the city in the case of persons who thereafter engaged in the activity proscribed.

The ordinance provided for administrative implementation of the provisions of the Charter amendment. The oath imposed by the ordinance proscribed to employees activity which had been denied them in identical terms and with identical sanctions in the Charter provision effective in 1941. The five-year period provided by the oath extended back only to 1943.

The ordinance would be *ex post facto* if it imposed punishment for past conduct lawful at the time it was engaged in. Passing for the moment the question whether separation of petitioners from their employment must be considered as punishment, the ordinance clearly is not *ex post facto.* The activity covered by the oath had been proscribed by the Charter in the same terms, for the same purpose, and to the same effect over seven years before, and two years prior to the period embraced in the oath. Not the law but the fact was posterior.

Bills of attainder are "legislative acts . . . that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial . . . ." *United States* v. *Lovett,* 328 U. S. 303, 315 (1946). Punishment is a prerequisite. See concurring opinion in *Lovett, supra,* at 318, 324. Whether legislative action curtailing a privilege previously enjoyed amounts to punishment depends upon "the circumstances attending and the causes of the deprivation." *Cummings* v. *Missouri,* 4 Wall. 277, 320 (1867). We are unable to conclude that punishment is imposed by a general regulation which merely provides standards of qualification and eligibility for employment.

*Cummings* v. *Missouri,* 4 Wall. 277 (1867), and *Ex parte Garland,* 4 Wall. 333 (1867), the leading cases in this Court applying the federal constitutional prohibitions against bills of attainder, recognized that the guarantees against such legislation were not intended to preclude legislative definition of standards of qualification for public or professional employment. Carefully distinguishing an instance of legislative "infliction of punishment" from the exercise of "the power of Congress to prescribe qualifications," the Court said in *Garland's* case: "The legislature may undoubtedly prescribe qualifications for the office, to which he must conform, as it may, where it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life." 4 Wall. at 379–380. See also, *Cummings* v. *Missouri, supra,* at 318–319. This doctrine was reaffirmed in *Dent* v. *West Virginia,* 129 U. S. 114 (1889), in which Mr. Justice Field, who had written the *Cummings* and *Garland* opinions, wrote for a unanimous Court upholding a statute elevating standards of qualification to practice medicine. And in *Hawker* v. *New York,* 170 U. S. 189 (1898), the Court upheld a statute forbidding

the practice of medicine by any person who had been convicted of a felony. Both *Dent* and *Hawker* distinguished the *Cummings* and *Garland* cases as inapplicable when the legislature establishes reasonable qualifications for a vocational pursuit with the necessary effect of disqualifying some persons presently engaged in it.

Petitioners rely heavily upon *United States* v. *Lovett,* 328 U. S. 303 (1946), in which a legislative act effectively separating certain public servants from their positions was held to be a bill of attainder. Unlike the provisions of the Charter and ordinance under which petitioners were removed, the statute in the *Lovett* case did not declare general and prospectively operative standards of qualification and eligibility for public employment. Rather, by its terms it prohibited any further payment of compensation to named individual employees. Under these circumstances, viewed against the legislative background, the statute was held to have imposed penalties without judicial trial.

Nor are we impressed by the contention that the oath denies due process because its negation is not limited to affiliations with organizations known to the employee to be in the proscribed class. We have no reason to suppose that the oath is or will be construed by the City of Los Angeles or by California courts as affecting adversely those persons who during their affiliation with a proscribed organization were innocent of its purpose, or those who severed their relations with any such organization when its character became apparent, or those who were affiliated with organizations which at one time or another during the period covered by the ordinance were engaged in proscribed activity but not at the time of affiant's affiliation.*

---

*In interpreting local legislation proscribing affiliation with defective organizations, the Supreme Court of California has gone beyond the literal text of a statute so as to require knowledge of the character of the organization, as of the time of affiliation, by the person

We assume that scienter is implicit in each clause of the oath. As the city has done nothing to negative this interpretation, we take for granted that the ordinance will be so read to avoid raising difficult constitutional problems which any other application would present. *Fox* v. *Washington,* 236 U. S. 273, 277 (1915). It appears from correspondence of record between the city and petitioners that although the city welcomed inquiry as to its construction of the oath, the interpretation upon which we have proceeded may not have been explicitly called to the attention of petitioners before their refusal. We assume that, if our interpretation of the oath is correct, the City of Los Angeles will give those petitioners who heretofore refused to take the oath an opportunity to take it as interpreted and resume their employment.

The judgment as to Pacifico and Schwartz is affirmed. The judgment as to the remaining petitioners is affirmed on the basis of the interpretation of the ordinance which we have felt justified in assuming.

*Affirmed.*

Mr. Justice Frankfurter, concurring in part and dissenting in part.

The Constitution does not guarantee public employment. City, State and Nation are not confined to making provisions appropriate for securing competent professional discharge of the functions pertaining to diverse

whose affiliation is in question. In *People* v. *Steelik,* 187 Cal. 361, 203 P. 78 (1921), the Court upheld a conviction under the Criminal Syndicalism Act of 1919 which made one guilty of a felony who "is" a member of any one of a certain class of proscribed organizations. The indictment in relevant part alleged that defendants "are and each of them is" a member of a proscribed organization. The court interpreted the statute as defining and the indictment as charging "the offense of criminal syndicalism in that he *knowingly* belonged" to a proscribed organization. (Emphasis added.) 187 Cal. at 376, 203 P. at 84.

governmental jobs. They may also assure themselves of fidelity to the very presuppositions of our scheme of government on the part of those who seek to serve it. No unit of government can be denied the right to keep out of its employ those who seek to overthrow the government by force or violence, or are knowingly members of an organization engaged in such endeavor. See *Gerende* v. *Board of Supervisors of Elections,* 341 U. S. 56.

But it does not at all follow that because the Constitution does not guarantee a right to public employment, a city or a State may resort to any scheme for keeping people out of such employment. Law cannot reach every discrimination in practice. But doubtless unreasonable discriminations, if avowed in formal law, would not survive constitutional challenge. Surely, a government could not exclude from public employment members of a minority group merely because they are odious to the majority, nor restrict such employment, say, to native-born citizens. To describe public employment as a privilege does not meet the problem.

This line of reasoning gives the direction, I believe, for dealing with the issues before us. A municipality like Los Angeles ought to be allowed adequate scope in seeking to elicit information about its employees and from them. It would give to the Due Process Clause an unwarranted power of intrusion into local affairs to hold that a city may not require its employees to disclose whether they have been members of the Communist Party or the Communist Political Association. In the context of our time, such membership is sufficiently relevant to effective and dependable government, and to the confidence of the electorate in its government. I think the precise Madison would have been surprised even to hear it suggested that the requirement of this affidavit was an "Attainder" under Art. I, § 10, of the Constitution. For reasons outlined in the concurring opinion in *United*

*States* v. *Lovett,* 328 U. S. 303, 318, I cannot so regard it. This kind of inquiry into political affiliation may in the long run do more harm than good. But the two employees who were dismissed solely because they refused to file an affidavit stating whether or when they had been members of the Communist Party or the Communist Political Association cannot successfully appeal to the Constitution of the United States.

A very different issue is presented by the fifteen employees who were discharged because they refused to take this oath:

> "I . . . do solemnly swear (or affirm) . . . that I . . . have not, within said period [from December 6, 1943], been or become a member of or affiliated with any group, society, association, organization or party which advises, advocates or teaches, or has, within said period, advised, advocated or taught, the overthrow by force, violence or other unlawful means of the Government of the United States of America, or of the State of California."

The validity of an oath must be judged on the assumption that it will be taken conscientiously. This ordinance does not ask the employee to swear that he "knowingly" or "to the best of his knowledge" had no proscribed affiliation. Certainty is implied in the disavowal exacted. The oath thus excludes from city employment all persons who are not certain that every organization to which they belonged or with which they were affiliated (with all the uncertainties of the meaning of "affiliated") at any time since 1943 has not since that date advocated the overthrow by "unlawful means" of the Government of the United States or of the State of California.

The vice in this oath is that it is not limited to affiliation with organizations known at the time to have advocated overthrow of government. We have here a very different

situation from that recently before us in *Gerende* v. *Board of Supervisors,* 341 U. S. 56.   There the Attorney General of Maryland assured this Court that he would advise the appropriate authorities to accept as the oath required by State law from a candidate for office, an affirmation that he is not engaged in the attempt to overthrow the Government by force or violence and that he is not knowingly a member of an organization engaged in such an attempt. The Attorney General did not give this assurance as a matter of personal relaxation of a legal requirement.   He was able to give it on the basis of the interpretation that the Court of Appeals of Maryland, the highest court of that State, had placed upon the legislation.   No such assurance was remotely suggested on behalf of Los Angeles.   Naturally not.   Nothing in the decisions under review would warrant such restricted interpretation of the assailed ordinance.*   To find *scienter* implied in a criminal statute is the obvious way of reading such a statute, for guilty knowledge is the normal ingredient of criminal responsibility.   The ordinance before us exacts an oath as a condition of employment; it does not define a crime. It is certainly not open to this Court to rewrite the oath required by Los Angeles of its employees, after the oath as written has been sustained by the California courts.

If this ordinance is sustained, sanction is given to like oaths for every governmental unit in the United States. Not only does the oath make an irrational demand.   It is

---

*Nothing in the decision or opinion of the Supreme Court of California in *People* v. *Steelik,* 187 Cal. 361, 203 P. 78, indicates that the courts of California would at their own instance read into the Los Angeles oath a limitation which is not there expressed.   In the *Steelik* case the court was considering a statute which provided that "Any person who . . . [o]rganizes or assists in organizing, or is or knowingly becomes a member of, any organization" teaching criminal syndicalism is guilty of a felony.   Cal. Stat. 1919, c. 188, § 2.   The court held only that the word "knowingly" qualified the word "is" in addition to the word "becomes."

bound to operate as a real deterrent to people contemplating even innocent associations. How can anyone be sure that an organization with which he affiliates will not at some time in the future be found by a State or National official to advocate overthrow of government by "unlawful means"? All but the hardiest may well hesitate to join organizations if they know that by such a proscription they will be permanently disqualified from public employment. These are considerations that cut deep into the traditions of our people. Gregariousness and friendliness are among the most characteristic of American attitudes. Throughout our history they have been manifested in "joining." See Arthur M. Schlesinger, Sr., Biography of a Nation of Joiners, published in 50 American Historical Review 1, reprinted in Schlesinger, Paths to the Present, 23.

Giving full scope to the selective processes open to our municipalities and States in securing competent and reliable functionaries free from allegiance to any alien political authority, I do not think that it is consonant with the Due Process Clause for men to be asked, on pain of giving up public employment, to swear to something they cannot be expected to know. Such a demand is at war with individual integrity; it can no more be justified than the inquiry into belief which MR. JUSTICE BLACK, MR. JUSTICE JACKSON and I deemed invalid in *American Communications Assn.* v. *Douds,* 339 U. S. 382.

The needs of security do not require such curbs on what may well be innocuous feelings and associations. Such curbs are indeed self-defeating. They are not merely unjustifiable restraints on individuals. They are not merely productive of an atmosphere of repression uncongenial to the spiritual vitality of a democratic society. The inhibitions which they engender are hostile to the best conditions for securing a high-minded and high-spirited public service.

It is not for us to write the oath that Los Angeles may exact. And so as to the fifteen employees I think the case should go back to the State court, with instructions that these petitioners be reinstated unless they refuse to take an oath or affirmation within the scope indicated in this opinion.

MR. JUSTICE BURTON, dissenting in part and concurring in part.

I.

I cannot agree that under our decisions the oath is valid. *United States* v. *Lovett,* 328 U. S. 303; *Ex parte Garland,* 4 Wall. 333; *Cummings* v. *Missouri,* 4 Wall. 277. The oath is so framed as to operate retrospectively as a perpetual bar to those employees who held certain views at any time since a date five years preceding *the effective date of the ordinance.* It leaves no room for a change of heart. It calls for more than a profession of present loyalty or promise of future attachment. It is not limited in retrospect to any period measured by reasonable relation to the present. In time this ordinance will amount to the requirement of an oath that the affiant has *never* done any of the proscribed acts. Cf. *Gerende* v. *Board of Supervisors,* 341 U. S. 56; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 413–414.

The oath is not saved by the fact that it reaches back only to December 6, 1943, and that city employees have been forbidden since April 28, 1941, under § 432 of the Los Angeles Charter, to advise, teach or advocate the violent overthrow of the Government. See the *Lovett, Garland* and *Cummings* cases, *supra.*

II.

I agree with the Court that the judgment should be affirmed as to petitioners Pacifico and Schwartz. They

executed the oath but refused to sign an affidavit calling for information as to their past or present membership in the Communist Party or the Communist Political Association. Such refusal does not now present the question of whether the Constitution permits the City to discharge them from municipal employment on the basis of information in their affidavits. We have before us only the question of whether municipal employees may be required to give to their employer factual information which is relevant to a determination of their present loyalty and suitability for public service. Such loyalty and suitability is no less material in candidates for appointment as municipal employees than in candidates for elective office, *Gerende* v. *Board of Supervisors, supra,* or union officers, *American Communications Assn.* v. *Douds, supra.*

Mr. Justice Black, dissenting.

I agree with the dissenting opinion of Mr. Justice Douglas but wish to emphasize two objections to the opinion of the Court:

1. Our *per curiam* opinion in *Gerende* v. *Board of Supervisors,* 341 U. S. 56, in no way stands for the principle for which the Court cites it today. In *Gerende,* we upheld a Maryland law that had been interpreted by the highest court of that state to require only an oath that a candidate "is not a person who is engaged 'in one way or another in the attempt to overthrow the government *by force or violence,*' and that he is not knowingly a member of an organization engaged in such an attempt." The oath and affidavit in the present case are obviously not so limited.

2. The opinion of the Court creates considerable doubt as to the continued vitality of three of our past decisions: *Cummings* v. *Missouri,* 4 Wall. 277; *Ex parte Garland,* 4 Wall. 333; *United States* v. *Lovett,* 328 U. S. 303. To

this extent it weakens one more of the Constitution's great guarantees of individual liberty. See, *e. g., Dennis* v. *United States, ante,* p. 494, and *Breard* v. *Alexandria, ante,* p. 622, decided this day.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, dissenting.

Petitioners are citizens of the United States and civil service employees of the City of Los Angeles. In 1948 the City of Los Angeles passed Ordinance No. 94,004 which requires each of its employees to subscribe to an oath of loyalty which included, *inter alia,* an affirmation that he does not advise, advocate, or teach, and has not within the five years prior to the effective date of the ordinance "advised, advocated or taught, the overthrow by force, violence or other unlawful means, of the Government of the United States of America or of the State of California," and that he is not and has not within that period been "a member of or affiliated with any group, society, association, organization or party which advises, advocates or teaches, or has, within said period, advised, advocated or taught, the overthrow by force, violence or other unlawful means of the Government of the United States of America, or of the State of California."

The ordinance also requires each employee to execute an affidavit stating "whether or not he is or ever was a member of the Communist Party of the United States of America or of the Communist Political Association, and if he is or was such a member, stating the dates when he became, and the periods during which he was, such a member."

The ordinance was passed to effectuate the provisions of § 432 of the Charter of Los Angeles (Cal. Stat. 1941, c. 67, p. 3409) which provides, *inter alia,* that no person who has within five years prior to the adoption of § 432 ad-

vised, advocated or taught the overthrow by force or violence of the government of the United States or of California, or who during that time has been a member of or affiliated with any group or party which has advised, advocated, or taught that doctrine, shall hold or retain or be eligible for any employment in the service of the city. Thus the ordinance and § 432 of the Charter read together make plain that prior advocacy or membership is without more a disqualification for employment. Both the oath and the affidavit are methods for enforcement of that policy.

Fifteen of the petitioners refused to sign either the oath or the affidavit. Two took the oath but refused to sign the affidavit. All seventeen were discharged—the sole ground being their refusal to sign the affidavit or to sign and to take the oath, as the case may be. They had an administrative review, which afforded them no relief. This suit was thereupon instituted in the California court, claiming reinstatement and unpaid salaries. Relief was denied by the District Court of Appeal, 98 Cal. App. 2d 493, 220 P. 2d 958; and a hearing was denied by the Supreme Court, three justices dissenting. The case is here on certiorari.

The case is governed by *Cummings* v. *Missouri,* 4 Wall. 277, and *Ex parte Garland,* 4 Wall. 333, which struck down test oaths adopted at the close of the Civil War. The *Cummings* case involved provisions of the Missouri Constitution requiring public officials and certain classes of professional people, including clergymen, to take an oath that, *inter alia,* they had never been "in armed hostility" to the United States; that they had never "by act or word" manifested their "adherence to the cause" of enemies of the country or their "desire" for the triumph of its enemies; that they had never "knowingly and willingly harbored, aided, or countenanced" an enemy; that they

had never been a "member of, or connected with, any order, society, or organization inimical to the government of the United States" or engaged "in guerilla warfare" against its inhabitants; that they had never left Missouri "for the purpose of avoiding enrolment for or draft into the military service of the United States" or become enrolled as a southern sympathizer.

The *Garland* case involved certain Acts of Congress requiring public officials and attorneys practicing before the federal courts to take an oath that they had "voluntarily given no aid, countenance, counsel, or encouragement to persons engaged in armed hostility" against the United States and that they had "neither sought nor accepted, nor attempted to exercise the functions of any office whatever, under any authority or pretended authority in hostility to the United States." The Court amended its rules of admission to require this oath.

Cummings, a Catholic priest, was indicted and convicted for teaching and preaching without having first taken the oath.

Garland, a member of the Bar of the Court, had served in the Confederate Government, for which he had received a pardon from the President conditioned on his taking the customary oath of loyalty. He applied for permission to practice before the Court without taking the new oath.

Article I, § 10 of the Constitution forbids any state to "pass any Bill of Attainder" or any "ex post facto Law." Article I, § 9 curtails the power of Congress by providing that "No Bill of Attainder or ex post facto Law shall be passed." The Court ruled that the test oaths in the *Cummings* and *Garland* cases were bills of attainder and *ex post facto* laws within the meaning of the Constitution. "A bill of attainder," wrote Mr. Justice Field for the Court, "is a legislative act which inflicts punishment

without a judicial trial." [1]   *Cummings* v. *Missouri, supra,* p. 323; and see *United States* v. *Lovett,* 328 U. S. 303, 317, 318.   The Court held that deprivation of the right to follow one's profession is punishment.   A bill of attainder, though generally directed against named individuals, may be directed against a whole class.   Bills of attainder usually declared the guilt; here they assumed the guilt and adjudged the punishment conditionally, *i. e.,* they deprived the parties of their right to preach and to practice law unless the presumption were removed by the expurgatory oath.   That was held to be as much a bill of

---

[1] Mr. Justice Field continued: "If the punishment be less than death, the act is termed a bill of pains and penalties.   Within the meaning of the Constitution, bills of attainder include bills of pains and penalties.   In these cases the legislative body, in addition to its legitimate functions, exercises the powers and office of judge; it assumes, in the language of the text-books, judicial magistracy; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial; it determines the sufficiency of the proofs produced, whether conformable to the rules of evidence or otherwise; and it fixes the degree of punishment in accordance with its own notions of the enormity of the offence." 4 Wall. p. 323.

In addition to the history of bills of attainder in England, the draftsmen of the Constitution had before them recent examples of such legislation by the Revolutionary governments of the states. Legislative action against persons of known or suspected Loyalist sympathies included outright attaint of treason or subversion (*e. g.,* Georgia, Act of March 1, 1778; Pennsylvania Laws 1778, c. 49; New York Laws 1779, Third Session, c. 25); proscription and banishment (*e. g.,* Massachusetts, Act of Sept. 1778, Charters and Gen. Laws, c. 48; New Hampshire Laws 1778, Fourth Session, c. 9); confiscation (*e. g.,* Delaware Laws 1778, c. 29b; New Jersey, Act of Dec. 11, 1778, Laws, p. 40); as well as numerous test oaths involving, among other penalties, disqualification from holding office or practicing certain professions.   See laws collected in Van Tyne, The Loyalists in the American Revolution, App. B, C; and generally, Thompson, Anti-Loyalist Legislation During the American Revolution, 3 Ill. L. Rev. 81, 147.

attainder as if the guilt had been irrevocably pronounced. The laws were also held to be *ex post facto* since they imposed a penalty for an act not so punishable at the time it was committed.

There are, of course, differences between the present case and the *Cummings* and *Garland* cases. Those condemned by the Los Angeles ordinance are municipal employees; those condemned in the others were professional people. Here the past conduct for which punishment is exacted is single—advocacy within the past five years of the overthrow of the Government by force and violence. In the other cases the acts for which Cummings and Garland stood condemned covered a wider range and involved some conduct which might be vague and uncertain. But those differences, seized on here in hostility to the constitutional provisions, are wholly irrelevant. Deprivation of a man's means of livelihood by reason of past conduct, not subject to this penalty when committed, is punishment whether he is a professional man, a day laborer who works for private industry, or a government employee. The deprivation is nonetheless unconstitutional whether it be for one single past act or a series of past acts. The degree of particularity with which the past act is defined is not the criterion. We are not dealing here with the problem of vagueness in criminal statutes. No amount of certainty would have cured the laws in the *Cummings* and *Garland* cases. They were stricken down because of the mode in which punishment was inflicted.

Petitioners were disqualified from office not for what they are today, not because of any program they currently espouse (cf. *Gerende* v. *Board of Supervisors*, 341 U. S. 56), not because of standards related to fitness for the office (cf. *Dent* v. *West Virginia*, 129 U. S. 114; *Hawker* v. *New York*, 170 U. S. 189), but for what they once

advocated. They are deprived of their livelihood by legislative act, not by judicial processes. We put the case in the aspect most invidious to petitioners. Whether they actually advocated the violent overthrow of Government does not appear. But here, as in the *Cummings* case, the vice is in the presumption of guilt which can only be removed by the expurgatory oath. That punishment, albeit conditional, violates here as it did in the *Cummings* case the constitutional prohibition against bills of attainder. Whether the ordinance also amounts to an *ex post facto* law is a question we do not reach.