BOARD OF REGENTS OF OKLA. AGRICULTURAL COLLEGES et al. v. UPDEGRAFF.

No. 35160. Oct. 18, 1951.

Rehearing Denied Nov. 6, 1951.

*237 P. 2d 131.*

Mac Q. Williamson, Atty. Gen., and Fred Hansen, First Asst. Atty. Gen., for plaintiffs in error.

Don Emery, Robert J. Emery, and Emery & Emery, Oklahoma City, for interveners plaintiffs in error.

Paul W. Updegraff, Norman, for defendant in error.

John G. Hervey, Ralph J. May, and Hervey & May, Oklahoma City, amicus curiae.

ARNOLD, C. J. This action was begun in the district court on May 9, 1951, by a taxpaying citizen to enjoin the Board of Regents of the Agricultural Colleges, the State Treasurer, and the State Auditor from paying public funds to teachers in the Agricultural and Mechanical College at Stillwater who had not subscribed to and filed the loyalty oath prescribed by Enrolled House Bill No. 8, 23rd Legislature (Laws 1951; 51 O. S. 1941 (Supp.) §§ 37.1-37.8). A temporary restraining order was issued.

Before the date fixed for the hearing on the application for temporary injunction, certain teachers in the College who had contracts with the Board of Regents to teach at least to the end of the school term, June 30, 1951, with leave of court filed their consolidated petition in intervention and cross-petitions praying for injunctive relief requiring the payment of their accrued monthly salaries.

When the cause came on for trial evidence by stipulation was introduced and entertained. The trial court made conclusions of law and entered the following judgment:

"It is therefore ordered, adjudged and decreed by the Court that the injunction should be made permanent in all things as set forth in the conclusions of law, and that interveners' petition for mandatory injunction is in all things denied, and costs are assessed against the defendants and the interveners. Exceptions allowed to all parties."

The cross-petitioners, none of whom had filed the oath required by the Act at the time of trial and entry of judgment in the latter part of May, 1951, and the Board of Regents make many contentions. It is not necessary nor expedient to set forth the various and varying contentions made by appellants. Only those propositions asserted which are essential to determine whether or not the trial court erred in refusing injunctive relief to interveners will be discussed.

Pertinent to the issues raised here the act provides:

"Every officer and every employee of the State, county, school district, municipality, public agency, public authority, or public district shall within the first thirty (30) days after taking office, or within the first thirty (30) days of such employment, take and subscribe to the oath or affirmation required by this Act. . . . Any officer or employee of the State, County, school district, municipality, public agency, public authority, or public district who fails to take and subscribe the oath or affirmation required by this Act within the time specified in this Section, shall forfeit his or her office or employment.

"The oath or affirmation required by this Act shall be the following:

"I, _ _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of Oklahoma against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of Oklahoma; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

. . . .

"And I do further swear (or affirm) that during such time as I am ------------------------------------------------- (Here put name of office, or, if an ------------------------------------------------- employee, insert 'An employee of' fol------------------------------------------------- lowed by the complete designation of ------------------------------------------------- the employing officer, office, agency, ------------------------------------------------- authority, commission, department, or ------------------------------------------------- institution.)

"I will not advocate and that I will not become a member of any party or organization, political or otherwise, that advocates the overthrow of the Government of the United States or of the State of Oklahoma by force or violence or other unlawful means."

"The Act further provides:

"No compensation nor reimbursement for expenses incurred shall be paid to any public officer or employee by any public agency unless such officer or employee has taken and subscribed to the oath or affirmation required by this Act."

The act provided for severability as to the various provisions thereof and severability as to parts of the oath.

Before going further into a specific discussion of alleged invalidity for certain stated reasons the apparent confusion as to the interpretation to be given the parts of the oath required should be dispelled. The phrase of the oath which refers to affiliation "with any foreign political agency, party, organization or Government, or with any agency, party, organization, association, or group whatever which has been officially determined by the United States Attorney General or other authorized agency of the United States to be a communist front or subversive organization," refers to a list or lists of such organizations in existence at the time of the passage of the act which had been prepared by the Attorney General under governmental directive. Such list or lists are in effect made a part of the oath by reference. It must be assumed they are readily obtainable. Nothing appears to the contrary. There was no attempt on the part of the Legislature to confer authority, judicial or otherwise, upon the Attorney General in the preparation of said list or lists. It also must be assumed that the Legislature determined for itself that all those groups so listed by the Attorney General, whether foreign or domestic, were subversive organizations or communist fronts. To illustrate: one taking the oath swears that he is not affiliated "with any foreign political agency" listed by the Attorney General as being a communist front or subversive organization. This part of the oath does not contemplate nonmembership in any organization, foreign or domestic, which does not appear on the list or lists of the Attorney General in existence at the time of the passage of the act. There is no requirement in the act that an oath be taken of nonmembership in organizations not on the list of the Attor-

ney General of the United States at the time of the passage of this act.

That part of the oath "that I will take up arms in defense of the United States in time of War or National Emergency, if necessary," means that the affiant will take up arms in time of War or National Emergency if by law required.

That part of the oath that says "that within the five (5) years immediately preceding the taking of this oath (or affirmation) I have not been a member of the Communist Party, . . ." refers to the same organizations listed by the Attorney General and in existence at the time of the passage of the Act. It has no reference to organizations that may have been added by the Attorney General after the passage of the act and up to the time of the taking of the oath. The oath under this phrase is to the effect that affiant has not been a member of any of the organizations so listed by the Attorney General within the five-year period previous to the taking of the oath.

The statement in the oath: "That I will support and defend the Constitution of the United States and the Constitution of the State of Oklahoma against all enemies, foreign and domestic," means that the affiant, be he citizen or resident alien, will support and defend the laws of this land and the form of government which is thereby established against all enemies, that is, subversive elements, whether foreign or domestic.

That part of the oath, "That I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of Oklahoma," is objected to only by a friendly alien. He asserts sincere fear that the oath in the respects hereinafter mentioned would in effect require him to forswear allegiance to his native country.

"Allegiance is of three kinds: (1) *natural or implied,* when it arises by operation of law, as in the case of natural-born subjects: (2) *acquired,* when it is owed by a person as a result of his receiving the rights of citizenship, as by naturalization or denization; (3) *local,* when it arises merely from the fact of residing in and receiving the protection of a country, as in the case of a resident alien."— Webster's International Dictionary.

Obviously, a resident alien taking the oath would be pledging allegiance of the local type; there is nothing in the oath which requires him to forswear his allegiance to his native country or the country of which he may be a citizen, nor is there anything in the oath which would conflict with any allegiance owed by him to the country of which he is a national. Any resident alien is bound to obey our laws as a condition of his residing here and receiving the protection of our laws, which he is entitled to if lawfully in the United States. If an employee of the State, it is just as necessary that he be loyal to our government, its laws and institutions while here and enjoying the full protection of our laws and sharing the benefits that our institutions and form of government afford, as it is that our citizens under like circumstances be loyal. He is also under the misapprehension that the requirement of the oath that, "I will take up arms in the defense of the United States in time of War, or National Emergency, if necessary," constitutes an assertion or oath by him that he would take up arms against the government of which he is a citizen. This part of the oath does not include or refer to a resident alien's native country of which he is a citizen. This conclusion is inescapable in recognition of the reasonableness and fairness of the Legislature. This interpretation will no doubt dispel any fears in the mind of such friendly alien. The Legislature did not intend to require as a condition precedent to employment by the State that one take an oath that in case of war he would bear arms against his native land.

The real design and purpose of the Legislature in the enactment of House

Bill No. 8 is not difficult to ascertain. The real purpose of the Legislature was to make loyalty a qualification to hold public office or be employed by the State. Incidentally, and in order to effectuate its real purpose, the Legislature also intended by the Act to force officers or employees of the State who are or have been within a fixed time members of the Communist Party or other subversive organizations out of governmental positions. It is now commonly known that the Communist Party and its members advocate the overthrow of government by force and violence. Such teaching and advocacy is contrary to our Democratic form of government and detrimental to the welfare of the people. The same thing may be said of any other subversive organization. Inasmuch as the authority of the Legislature extends to all rightful subjects of legislation, it is not only the duty of the Legislature but it has the power to protect the general welfare of the people of the State by the exercise of the police power against subversive influences. The act in question constitutes an exercise of the police power by the Legislature. Such acts are valid so long as they are not unreasonable, arbitrary, and capricious and do not violate any of the fundamental constitutional guaranties of the State and Federal Constitutions. We recently said, in the case of Palmer Oil Corp. v. Phillips Petroleum Co. et al., 204 Okla. 543, 231 P. 2d 997:

"The Legislature is itself the judge of the conditions which warrant legislative enactments, and they are only to be set aside when they involve such palpable abuse of power and lack of reasonableness to accomplish a lawful end that they may be said to be arbitrary, capricious, and unreasonable, and hence irreconcilable with the conception of due process of law. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are ordinarily matters for the judgment of the Legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."

The Act does not impair obligation of contract contrary to article II, section 15 of the Oklahoma Constitution and article I, section 10 of the Constitution of the United States.

"All parties dealing with a sovereign power, or one of its functionaries, in the exercise of governmental power, the subject of which pertains to government (schools in this case), do so knowing it cannot contract . . . the power conferred for self-protection or self-preservation. The rule, therefore, that the Legislature can pass no law impairing the obligation of contracts does not apply to parties dealing with a department of government concerning the future exercise of powers conferred for public purposes by legislative acts, where the subject matter of the contract is one which affects the safety and welfare of the public. In such cases 'the presumption is that, when such contracts are entered into, it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the police power of the Legislature'. Chicago, B. & O. R. v. Nebraska, 170 U.S. 72, 42 L. Ed. 948, 18 Sup. Ct. 513." Board of Education of the City of Leavenworth v. Phillips, 67 Kan. 549, 73 P. 97.

To hold otherwise would be to subject the exercise of the police power inherently vested in a sovereign people to the will of contracting individuals. See Boston Beer Co. v. Mass., 97 U.S. 33, 24 L. Ed. 989.

The statute and the required loyalty oath do not deprive public officials and employees of property or liberty without due process of law. The interveners are employees of the state as teachers in a public institution. They have no constitutional right to be so employed. They have no right to so serve the state except upon such terms as the state prescribes. The act does not purport to take away their right to teach. Public institutions do not have

to hire nor retain employees except on terms suitable to them. People v. Crane, 214 N. Y. 154, 108 N.E. 427, L.R.A. 1916D, 550; Heim v. McCall, 239 U.S. 175, 60 L. Ed. 207, 36 S. Ct. 78; Ellis v. U.S., 206 U.S. 246, 51 L. Ed. 1047, 27 S. Ct. 600; McAuliffe v. Mayor, etc., City of New Bedford, 155 Mass. 216, 29 N.E. 517.

Like the success of a business, the preservation of peace, the public welfare and the integrity of law and order, in fact, our form of government, are dependent upon loyalty of public officials and employees of government. This is well known and fully recognized by all well intentioned people. Public officials assume office and employees of the state enter upon their duties with full knowledge, and in these times expectation, that the state will, if it has not already done so, make full investigation on the point and if thought expedient require an oath disclosing the attitude of public officials and employees. Loyalty should be and by House Bill No. 8, 23rd Legislature, is a prescribed qualification of public officials and employees of the state. Interveners are such employees.

It is alleged by some conscientious objectors that the required loyalty oath invades their freedom of religion guaranteed by both the State and Federal Constitutions. The part of the oath which it is alleged so invades this guaranty is "that I will take up arms in defense of the United States in time of War, or National Emergency, if necessary" (that is, if by valid law required). The provisions of the Constitutions against the enactment of any law prohibiting the free exercise of religion "embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." Cantwell et al. v. State of Connecticut, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213. Though some sort of exemption has always been provided for conscientious objectors in the matter of bearing arms

in time of war, such persons could be legally required to bear arms. Under such a legal requirement a citizen of the United States, though a conscientious objector, would be disloyal if he absolutely refused to obey such law. Loyalty in upholding the Constitutions and laws, State and Federal, may be made a qualifying prerequisite to employment by the State. Religious practice, though in conformity with religious belief, may be interfered with where such practices are in violation of law. A conscientious objector taking the oath required can still entertain such religious beliefs as his conscience dictates and act freely in the exercise thereof so long as he does not violate or refuse to obey laws. The required oath does not invade one's constitutional right to the free exercise of religion guaranteed by article I, section 2 of the Oklahoma Constitution and the First Amendment of the Federal Constitution. For interesting reading on the subject, see Wooley v. Watkins, 2 Idaho 590, 22 P. 102.

Is this act a bill of attainder or expost facto law? A bill of attainder is a legislative act which inflicts punishment without judicial trial. It is contended that the act is a bill of attainder because it punishes one for refusal to take an oath that he has not been a member of listed organizations by vacating his position and denying him compensation. We think the Supreme Court of the United States has answered the question in Garner v. City of Los Angeles, 98 Cal. A. 2d 493, 220 P. 2d 958; Id., 341 U. S. 716, 71 S. Ct. 909, 95 L. Ed. 1317, decided June 4, 1951. In that case civil service employees of the City of Los Angeles were discharged because they would not subscribe to an oath similar to that provided by the Oklahoma Act. In upholding the ordinance requiring the taking of such an oath and holding that the ordinance was not a bill of attainder, the United States Supreme Court said:

"We are unable to conclude that punishment is imposed by a general

regulation which merely provides standards of qualification and eligibility for employment."

An ex post facto law is one which provides a punishment for an act which was innocent when committed. Punishment is a necessary incident to either a bill of attainder or an ex post facto law. Punishment such as contemplated by the inhibiting clauses of the State and Federal Constitutions is not present here. The act is neither a bill of attainder nor an ex post facto law.

The Legislature had the power and authority to prescribe qualifications for teachers in our public institutions, and the duty to do so, and if it deemed necessary require a loyalty oath as a qualifying and necessary precedent to compensation for services rendered by employees of the state.

The Legislature had the power and duty to prescribe qualifications for teachers in our public institutions. The loyalty oath required as a prerequisite to payment for teaching in our public institutions cannot be said as a matter of law to be unreasonable, arbitrary, and capricious or to violate any constitutional rights guaranteed by either the State or Federal Constitutions. All parts of the loyalty oath required appear to be reasonably related to the purposes of the Act.

The judgment denying injunctive relief to interveners on their cross-petitions is affirmed.