JANVIER, Judge.
Saul Gottlieb entered into a written contract with the City of New Orleans under which he was to “assemble, write, summarize, and edit the book of departmental regulations of the City of New Orleans as required by the City Charter.” The contract provided that he should be paid a maximum sum of $1,000; that the work would be completed within a period of four months; that he would be paid at the rate of $250 per month and that if the work should be completed within three months, he would be paid $250 for each of the three months and an additional $50. The city reserved the right to terminate the contract if, in the opinion of the "Acting Mayor and/or of the Chief Administrative Officer, the performance of Mr. Gottlieb should be unsatisfactory or below expectations.”
Gottlieb brought this suit against the city for $250 alleging that, during the first three months, he devoted himself to the work contemplated by the contract and was paid $250 per month, a total sum of $750; that he could have completed the work within the fourth month and would have been entitled to the additional $250; that he was “ready, willing and able * * * ” to complete the work but that, though the city was not dissatisfied with the manner in which he was performing the work, he was not permitted to complete it.
The city admitted the execution of the contract and that the plaintiff had worked under it and had been paid $750. It admitted that it had refused to pay him the additional $250, and averred that “his services were terminated for cause,” and it specifically averred “that plaintiff refused to answer directives relevant to his fitness and suitability for public service as ordered by the Chief Administrative Officer of the City of New Orleans, * * * ”. It then denied the allegation that it was not dissatis *243 fied with his work and averred that on March 23rd and 29th, plaintiff was asked by the Chief Administrative Officer “certain questions relevant to his suitability and fitness for public service” and that he refused to answer these questions. The city further averred that on April 3rd plaintiff again “was asked certain questions relevant to his suitability and fitness for public service with the City of New Orleans” and that he refused to answer these questions.
At the trial below, after testifying that he had performed the work to the satisfaction of the Chief Administrative Officer of the city, on cross-examination plaintiff was asked certain questions which he refused to answer and which he admitted that he had refused to answer when he had been asked the same questions by the Chief Administrative Officer of the city during the progress of the work. It may be noted that the record showed that when he had been asked the same questions by the Chief Administrative Officer, he had claimed his right to refuse to answer for fear of the possibility of incriminating himself. In the Court a qua he refused to answer the questions and did not express a desire to take advantage of the Fifth Amendment of the Constitution of the United States. Among the questions was the following:
“Would you refuse to give direct Yes or No answers as to whether or not you have been a member of the Communist party ?”
He answered that he had refused to answer that question and he refused to answer it during the trial of the case. He was then asked whether he had refused to say whether, if questioned by the Police Department, he would answer Yes or No to questions regarding his “political or idea-logical beliefs” and to questions bearing on his “present membership in organizations.” He admitted that he had refused to answer that question and refused to answer the same question in Court. He was asked whether the Chief Administrative Officer had asked him:
“Would you be willing and able to tell me and the police if called upon, that you have never been a member of the Communist party and are not now a member of that party?”
Again he stated that he had refused to answer the question and that he would refuse to answer it in Court. He refused to answer certain similar questions concerning his membership in such organizations as the Communist Party. Finally he was asked whether he was “personally sympathetic or favorable to the aims and purposes of Communism.” In answer to this question he entered into a bombastic tirade as follows:
“I’m not personally sympathetic or favorable to the aims and purposes of Communism; I’m neither personally or professionally sympathetic to its aims, and I abhor and condemn Communism as a political philosophy, or as a political movement, in any country on earth, and I’m against Communism in any shape, form or fashion whatsoever.”
It should be noted that even in this oration he did not state that he was not a member of the Communist Party. It should be noted, too, that obviously there is no way in which his real views towards Communism can be ascertained. Thus he could not be prosecuted for perjury as a result of his statement that he did not believe in Communism.
On the other hand, had he said that he was not a member of the Communist Party or that he had not joined other such subversive organizations his statements might have been found to be false and thus he might have subjected himself to prosecution for perjury. It was no doubt for this reason, that after discussing the matter with counsel, he merely refused to answer questions as to any such membership.’
*244 We think it is also significant that the record indicates that on at least one occasion he had expressed admiration for a notorious Herman Liveright who, as a result of a sensational investigation into his loyalty to the United States, had been prosecuted and found guilty of contempt of Congress. When first asked questions concerning the said Liveright and concerning his admiration for him, he denied making any such statements. However, he finally admitted that, on at least oné occasion, when he was rather “high”, he might have expressed admiration' for the said Liveright.
Thus the question which confronts us is whether or not, because of his refusal to state whether he was a member of the Communist Party, the city was justified in terminating his employment.
Unfortunately, we think, it seems to have been held by the Supreme Court of the United States that membership in that despicable organization may not of itself be availed of for the purpose of discharging an employee. The Supreme Court so held in Slochower v. Board of Higher Education of City of New York, 350 U.S. 551, 76 S.Ct. 637, 640, 100 L.Ed. 692. There the question involved was the constitutionality vel non of a provision in the charter of the City of New York to the effect that
“whenever an employee of the City utilizes the privilege against self-incrimination to avoid answering a question relating to his official conduct, ‘his term or tenure of office or em-employment shall terminate and such office or employment shall be vacant, and he shall not be eligible to election or appointment to any office or employment under the City or any agency.’ * * s¡¡ »
In that decision the Court reached the conclusion that mere membership could not of itself be used to discharge an employee, stating that in an earlier case, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, it had pointed out “that membership itself may be innocent” and had held that “the classification of innocent and guilty together was arbitrary.”
We would find ourselves under necessity of following that result if that were the exact question presented here. However, the question here is not whether a person who admits membership in such an organization should be automatically discharged, but whether refusal to answer such a question justifies dismissal. And the Supreme Court of the United States seems to have answered that question in an earlier decision, Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 720, 71 S.Ct. 909, 912, 95 L.Ed. 1317.
In the Garner case the Supreme Court, as stated by that Court in the Slochower case, “upheld the right of the city to inquire of its employees as to ‘matters that may prove relevant to their fitness and suitability for the public service’, including their membership, past and present, in the Communist Party or the Communist Political Association.” And the Court then, in the Slochower case, stated that in the Garner case
“ * * * it was held that the city had power to discharge employees who refused to file an affidavit disclosing such information to the school authorities.”
The only distinctions which may be found between the case at bar and the Garner case are that in the Garner case there was a state statute which was held to authorize the dismissal and there the employee was a regular employee and not one who had been specially employed to do a special job.
We do not see that those differences constitute a distinction which would justify a result here different from that reached there. Here Gottlieb was an employee of the city. The city had the right to ask questions as to his loyalty and as to his membership in such subversive organiza *245 tions as the Communist Party. It had the right to make certain that the work which he was employed to do should be done by one completely loyal and not by one who was unwilling to state whether he was a member of an organization which, as is well known, has as its principal object the overthrow of the United States Government. His discharge was justified.
Accordingly the judgment appealed from is affirmed at the cost of appellant.
Affirmed.