1999 OK CIV APP 45

## In the Matter of the ESTATE OF Gertrude Jo GELLER, deceased.

### Holly White, Appellant,

v.

**David L. Fist, personal representative of the Estate of Gertrude Jo Geller, deceased; Lori Anne Chozen; Jay Myers Chozen; Michael Alan Chozen; Marshall Geller; and, Temple Israel Foundation, Inc., Appellees.**

### No. 91,420.

Court of Civil Appeals of Oklahoma, Division No. 2.

Jan. 12, 1999.

Certiorari Denied April 6, 1999.

---

Anthony P. Sutton, Herrold, Herrold, Sutton & Davis, P.A., Tulsa, Oklahoma, For Appellant

J. Douglas Mann, Jerry A. Richardson, Rosenstein, Fist & Ringold, Tulsa, Oklahoma, For Appellee Fist

Frederic Dorwart, J. Michael Medina, Richard J. Cipolla, Jr., Frederic Dorwart Lawyers, Tulsa, Oklahoma, For Appellees Chozen

W. Thomas Coffman, Johnson, Allen, Jones & Dornblaser, Tulsa, Oklahoma, For Appellee Geller

Amelia A. Fogelman, Oliver S. Howard, Jeffrey D. Hassell, Gable & Gotwals, Tulsa, Oklahoma, For Appellee, Temple Foundation

## OPINION

### STUBBLEFIELD, P.J.

¶1 This is an appeal from judgment in a probate case, based on a finding that contestant lacked standing, denying a will contest and striking a counterclaim requesting determination of heirship. Based on our review of the record on appeal and applicable law, we affirm.

¶2 The record reveals that Gertrude Geller was married to Louis Myers for many years and had two children from that marriage, a son, Jay, and a daughter, Linda. Jay Myers was born on June 13, 1936, and died of leukemia on March 3, 1961. Jay Myers had never married, never adopted a child nor took a child into his home and was never determined to be the father of any child in a paternity action or named a party in such an action prior to his death. Linda Myers Chozen died on February 22, 1991. She was survived by three children, Lori Chozen, Michael Chozen and Jay Myers Chozen.

¶3 In 1975, Gertrude Geller married Marshall Geller. There were no children from that marriage.

¶4 On May 25, 1991, Plaintiff Holly White contacted Gertrude Geller by telephone, claiming to be her granddaughter— the child of Mrs. Geller's deceased son, Jay Myers. Apparently, Mrs. Geller did not wish to communicate with White and, through her attorney, David Fist, requested that White refrain from further attempts to contact her.

¶5 On June 26, 1991, Gertrude Geller executed her Last Will and Testament.[1] After gifts to grandnieces and grandnephews and certain charitable gifts, including a substantial charitable gift to Temple Israel Foundation, Gertrude Geller named Linda's three children as her residual beneficiaries. "Article IX" of her will contained the following "Forced Heirship and Will Contest Clause:"

1. I hereby direct that should there be anyone not herein specifically or indirectly mentioned or provided for who would inherit a portion of my estate had I not executed this Will, such person or persons shall receive One Dollar ($1.00) as his, her

---

1. Gertrude Geller executed three codicils to her will, in October 1993, September 1994 and February 1997.

or their sole and entire inheritance from me.

¶ 6 Gertrude Geller died on October 26, 1997, leaving a substantial estate. Three days later, after learning of Mrs. Geller's death through a newspaper obituary, Holly White filed (1) petitions for letters of administration and determination of heirship, (2) a motion seeking to take a tissue specimen from Gertrude Geller's body, and (3) a motion for temporary restraining order seeking to enjoin the interment of Mrs. Geller's body. White alleged she was the child of Jay Myers—that her mother had a sexual encounter with Myers in 1959 in Kansas City, Missouri, which resulted in White's birth on December 25, 1959—and she sought to inherit her pro rata share of Geller's estate.

¶ 7 Another petition for probate of will was filed by attorney David Fist on behalf of the Estate of Gertrude Geller.[2] White filed a counterclaim seeking to prove her heirship as a pretermitted granddaughter of Mrs. Geller. She filed various pleadings in the probate action, including a motion for partial summary judgment asserting that the terms of Geller's will and the provisions of 58 O.S.1991 § 132, required determination by the trial court that she was a pretermitted heir to Geller's estate as a matter of law—subject to her ability to prove that Jay Myers was, in fact, her biological father.

¶ 8 The special administrator moved to strike White's pleadings on the ground that she had no standing to pursue her claims of inheritance as a pretermitted grandchild in the probate court due to her undisputed inability to establish any of the four grounds set forth in 84 O.S.1991 § 215,[3] for an out-of-wedlock child to show paternity and inherit through the father. The Chozen family also filed a motion for summary judgment based on standing and the will's in terrorem clause. The issues were thoroughly briefed.

¶ 9 The trial court rendered judgment on the dispositive issue of standing. The trial court sustained the special administrator's motion to strike all pleadings filed by White. In finding that White had no standing to make a claim in the proceeding, the trial court adopted "in toto" the reasoning and legal authorities set forth in the briefs filed by the special administrator, Temple Israel and the Chozen family that specifically addressed the issue of standing. White appeals.

¶ 10 As a preliminary matter, we note that, technically, a motion to strike was not the proper method for disposing of the counterclaim and other pleadings filed by White. Title 12 O.S.1991 § 2012(D), provides only for motions to strike "an insufficient defense." The proper method for asserting a party's lack of standing is by motion to dismiss. *See Independent Sch. Dist. No. 9 of Tulsa County v. Glass*, 1982 OK 2, ¶ 10, 639 P.2d 1233, 1237. Thus, we view the improperly denominated motion to strike filed by the special administrator as the functional equivalent of such a motion under section 2012(B)(6)—a motion to dismiss for failure to state a claim upon which relief can be granted. However, because matters outside the pleadings were presented to and not excluded by the trial court, the motion must be treated as one for summary judgment. Section 2012(B).

¶ 11 In her first proposition of error, White specifically addresses the issue of standing. A party has standing either through a specific statute authorizing invocation of the judicial process or if she alleges a personal stake in the outcome of the controversy—"a sufficient interest in an otherwise justiciable controversy to obtain judicial resolution of the controversy." *Glass*, 1982 OK 2 at ¶ 8, 639 P.2d at 1237. To have standing to participate in a probate proceeding or to object to the probate of a will, a person must have an interest in the property that the

---

2. Fist was named as second successor personal representative in the will and alleged that others named had declined to serve. Fist was appointed as special administrator of the estate.

3. The statute was revamped and amended in 1977 to cure the 1910 law's unconstitutional

"inheritance discrimination against a non-connubial child and [now] places the latter on the same heirship footing with a connubial child." *Vincent v. Sutherland*, 1984 OK CIV APP 40 ¶ 9 n. 2, 691 P.2d 85, 87 n. 2.

testator owned at his death. *See Mayweather v. Wallace,* 195 Okla. 587, 159 P.2d 529 (1945); *In re Estate of Dilley,* 1996 OK CIV APP 64, ¶ 8, 919 P.2d 458, 460.

¶ 12 White summarizes her argument on the issue of standing as follows:

Upon the death of the decedent, Gertrude Geller, White vested in her right to share in the decedent's estate as a pretermitted paternal granddaughter. Based upon this vested right, White had standing to prove heirship in the probate court.

However, under Oklahoma law, children born out of wedlock may become heirs of and inherit through their father only by the methods set forth in 84 O.S.1991 § 215, which provides:

For inheritance purposes, a child born out of wedlock stands in the same relation to his mother and her kindred, and she and her kindred to the child, as if that child had been born in wedlock. *For like purposes, every such child stands in identical relation to his father and his kindred, and the latter and his kindred to the child, whenever:* (a) the father, in writing, signed in the presence of a competent witness acknowledges himself to be the father of the child, (b) the father and mother intermarried subsequent to the child's birth, and the father, after such marriage, acknowledged the child as his own or adopted him into his family, (c) the father publicly acknowledged such child as his own, receiving it as such, with the consent of his wife, if he is married, into his family and otherwise treating it as if it were a child born in wedlock, or (d) the father was judicially determined to be such in a paternity proceeding before a court of competent jurisdiction. (Emphasis added.)

The supreme court has noted that this statute places special burdens on children born out of wedlock before they can inherit through their father. *In re Estate of King,* 1990 OK 138, ¶ 6, 837 P.2d 463, 464.

¶ 13 It is undisputed that part (a), part (b) and part (d) are not applicable herein. White does not allege that a written parental acknowledgment exists or that her parents intermarried. Further, no determination of paternity was made before Jay Myers' death. White's only evidence goes to part (c)—public acknowledgment. She offered the affidavit of her mother, which stated: (1) In June 1959, she had informed Jay Myers she was pregnant with his child; (2) Myers advised her that "he had discussed the matter with his father and that his father had told him to 'do the right thing;' " (3) Jay Myers offered to provide financial assistance; and, (4) She called Myers again near the term of her pregnancy and he gave his reassurance and again offered his financial assistance.

¶ 14 We find this evidentiary material simply fails to establish the statutorily required public acknowledgment of section 215(c)—it fails to show that Jay Myers held Holly White out to his relatives, friends, acquaintances and the whole world as his own. *Kirkland v. Henry,* 1956 OK 130, ¶ ——, 296 P.2d 165, 167; *In re Cravens' Estate,* 1954 OK 82, ¶ ——, 268 P.2d 236, 240. Therefore, the affidavit does not raise a material issue of fact precluding summary judgment.

¶ 15 Focusing on the language of section 215(d), White urges a construction of that language that would authorize her to bring a paternity proceeding against Jay Myers within this probate proceeding despite the fact that Myers has been dead for thirty-seven years. However, the court in *King* stated that section 215(d) requires "a judicial determination of paternity *before the death of the father."* 1990 OK 138 at ¶ 12, 837 P.2d at 467 (emphasis added). We cannot agree with White's contention that the court's language is dicta.

¶ 16 Moreover, we do not view the trial court's ruling herein as one that completely precluded White from proving heirship in the probate court. The extensive briefs and evidentiary materials filed below indicate that the trial court gave White ample opportunity to show paternity/heirship through the four methods that the legislature clearly and explicitly set forth in section 215. Indeed, at the hearing on the motion to strike, the trial court asked White's counsel more than once if there was "anybody else" who could serve as a witness on the public acknowledgment issue.

¶ 17 What the trial court did not allow White to do was prove heirship by her preferred method—exhumation of her alleged father's body—a method that the legislature did not include in section 215. As section 215(d) is phrased—"the father was judicially determined to be such in a paternity proceeding ..."—it does not appear to contemplate post-death genetic testing, and the supreme court has explicitly stated that it does not. *Id.*

¶ 18 In White's final proposition of error, and its sub-propositions, she claims section 215 is unconstitutional as applied to her. She attacks section 215(d) on equal protection grounds, calling it an impermissible special law, and asserts that, if section 215(d) requires a "before death" determination of paternity, the statute operates to deny her vested right to inherit by and through her father without due process of law. For the following reasons, we find no merit to any of White's constitutional claims.

¶ 19 First, in *King,* the supreme court specifically concluded that "[s]ection 215 of title 84 does not violate the Equal Protection Clause of the federal Constitution." *Id.* at ¶ 10, 837 P.2d at 466. Moreover, White's due process rights are not implicated. She argues that past circumstances operated to preclude her from obtaining her inheritance rights: (1) At the time of Jay Myers' death in 1961, the existing version of section 215 was unconstitutional; (2) She had no opportunity to undertake a paternity action during Jay Myers' lifetime due to her incapacity as a minor; and, (3) When the legislature added section 215(d) in 1977, she was precluded from using the amendment because her alleged father had been dead for sixteen years.

¶ 20 However, contrary to White's assertions, she had no "vested right" during any of these three periods to inherit from Gertrude Geller's estate through Jay Myers. As the court noted in *In re Smith's Estate,* 188 Okla. 158, 161, 107 P.2d 188, 191 (1940) (citations omitted)(emphasis added): "[T]he *prospect* of inheritance does not constitute a vested right and is not properly defined as property." The laws of descent and distribution are subject to change at any time, and

"no one has a vested right to inherit the property of any person prior to the time descent is cast." *Minshall v. Berryhill,* 83 Okla. 100, 104, 205 P. 932, 935 (1921). Any rights of inheritance extended to White would not have accrued until the time of Gertrude Geller's death, *Hurt v. Noble,* 1991 OK CIV APP 59, 817 P.2d 744, and would be governed by the law in effect *at that time. See In re Estate of Baxter,* 1992 OK CIV APP 15, ¶ 17, 827 P.2d 184, 187.

¶ 21 White also asserts that section 215 is an "ex post facto law" and an unconstitutionally impermissible bill of attainder. These assertions also are without merit.

¶ 22 As noted above, White had no accrued or vested right to make a claim against Gertrude Geller's estate at any time before Mrs. Geller's death. Thus, application of the 1977 amendment of section 215 does not retrospectively affect any legal consequences or relations. It simply is not an ex post facto law.

¶ 23 Nor is section 215 a bill of attainder. White is correct in pointing out that bills of attainder are prohibited by U.S. Const. art. I, §§ 9 and 10, and Okla. Const. art. 2, § 15. A bill of attainder is a legislative act that inflicts punishment without judicial trial. *Board of Regents of Okla. Agric. Colleges v. Updegraff,* 205 Okla. 301, 237 P.2d 131 (1951), *rev'd on other grounds, Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Punishment is a prerequisite for a law to be a bill of attainder. *Garner v. Board of Public Works of Los Angeles,* 341 U.S. 716, 722, 71 S.Ct. 909, 95 L.Ed. 1317 (1951). A Supreme Court Justice has noted:

Punishment presupposes an offense, not necessarily an act previously declared criminal, but an act for which retribution is exacted. The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking, all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation.

*United States v. Lovett,* 328 U.S. 303, 324, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946)(Frankfurter, J., concurring). The Oklahoma Supreme Court also has recognized that a statute does not inflict punishment on an individual merely because it prevents him from doing what he otherwise could do in the absence of such statute. *Golden v. Okfuskee County Election Bd.,* 1986 OK 57, 723 P.2d 982. No punishment is imposed by section 215, and no offense is identified. Therefore, it is not a bill of attainder.

### Conclusion

¶ 24 The Oklahoma Supreme Court has determined that 84 O.S.1991 § 215, in its present form, and with the "special burdens" it imposes, is constitutional and protects the State's legitimate interest in the orderly disposition of estates. *King,* 1990 OK 138 at ¶ 10, 837 P.2d at 466. The statute provides four methods by which a child born out of wedlock can establish paternity for purposes of inheriting from or through the father. The evidentiary materials of record show that White is unable to establish paternity by any of the four statutory methods. Therefore, White is not an heir

of Gertrude Geller[4] and has no standing in the probate proceeding. In effect, White asks this court to rewrite section 215 to allow the exhumation and genetic testing of her alleged father. This we cannot do. The right to inherit property is granted solely by statute, *In re Estate of Baxter,* 1992 OK CIV APP 15, ¶ 17, 827 P.2d 184, 187, and succession to estates is strictly a matter of statutory regulation, which cannot be changed by courts. *In re Estate of Swartz,* 1994 OK CIV APP 7, ¶ 3, 870 P.2d 179, 180.

¶ 25 In view of the foregoing rationale, the trial court's order, which in effect granted summary judgment against White on her counterclaim for determination of heirship in the probate proceeding, is AFFIRMED.

BOUDREAU, V.C.J., and REIF, J., concur.

---

4. Of course, it follows that if White is not an heir—she is not entitled to inherit from Gertrude Geller through her alleged father, Jay Myers— she cannot be a pretermitted heir under 84 O.S. 1991 § 132.