In the Matter of Max Lerner, Appellant, against Hugh J. Casey et al., Constituting the New York City Transit Authority, Respondents.

Second Department, June 25, 1956.

Leonard B. Boudin for appellant.

Daniel T. Scannell and Edward L. Cox, Jr., for respondents.

Jacob K. Javits, Attorney-General (James O. Moore, Jr., and Ruth Kessler Toch of counsel), in his statutory capacity under section 71 of the Executive Law.

UGHETTA, J.   With the outbreak of hostilities in Korea in 1950, the world's attention was rudely focused on the increasing audacity of the communist conspiracy, by force or by guile, to accomplish its long-announced aim of taking over the free world.   The Legislature, early in its next session, accordingly enacted chapter 233 of the Laws of 1951, effective March 24, 1951, hereinafter referred to as the " Security Risk Law."

Section 1 is a declaration of legislative findings and intent.   It refers to the Korean situation, and then finds that the employment by government of members of well-organized and rigidly disciplined subversive groups presents a grave peril to the national security.   It is then found that " If members of such

organizations and groups and persons concerning whom reasonable grounds exist for the belief that, because of doubtful trust and reliability, their employment in public service in security positions would endanger the security or defense of the nation and the state, are permitted to hold public office and employment, their retention in security positions during the existence of a national emergency would imperil or endanger the safety, welfare or best interests of the armed forces, the civilian defense forces and the people of this state and of the United States." Having found the existence of this danger as a fact, the section then points to the remedy — "it is vital and essential that measures be taken to effect the disqualification for entrance into and the suspension and removal from security offices and positions in governmental service of persons concerning whom reasonable grounds exist for the belief that, because of doubtful trust and reliability, their employment in security positions would endanger the security or defense of the nation and the state."

Section 5 provides for the transfer to nonsecurity positions or agencies of employees deemed to be security risks. This section specifically refers to a " security position " or " position in a security agency ". A finding that the position itself is a sensitive one is not required. It is sufficient that it be in an agency that the State Civil Service Commission has determined to be one wherein functions are performed which are necessary to the security or defense of the nation and the State or where confidential information relating to such security or defense may be available, and such determination by the commission is subject to review by the courts (§§ 2, 3). Section 5 further provides for the suspension of employees when it is found " after proper investigation and inquiry, that, upon all the evidence, reasonable grounds exist for belief that, because of doubtful trust and reliability, the employment of such person in such position would endanger the security or defense of the nation and the state." The suspended employee is to be given notice of such action and of the reasons therefor and is to be afforded an opportunity, within 30 days after such notice, to submit statements or affidavits. Thereafter, following such further investigation and review as is deemed necessary, his transfer shall be affirmed or his employment terminated, if it shall be found that upon all the evidence, reasonable grounds exist for the belief that, because of doubtful trust and reliability his employment would endanger the security or defense of the nation and the State. Otherwise he is to be restored to his position and is entitled to back pay for the period of his sus-

pension. Section 6 provides for an appeal from the determination to the State Civil Service Commission and for a hearing by that body or by persons designated by it, and further provides that the decisions of the commission shall not be reviewable by the courts.

Section 7 provides that evidence shall not be restricted by the rules prevailing in the courts, that a finding may be based on previous conduct including, but not limited to, treasonable or seditious conduct or membership in any organization or group found by the State Civil Service Commission to be subversive. Section 8 defines a subversive group or organization to be one which is found by the State Civil Service Commission, after inquiry, to advocate, advise, teach or embrace the doctrine of overthrow of the government by force and violence. The commission, in making such inquiry, may utilize any listings or designations promulgated by, among others, any Federal agency, and may adopt designations of the United States Attorney General, provided such designation was made after due notice to such organization or group and an opportunity afforded it to answer.

Appellant has been removed pursuant to this statute from his position as a conductor on the New York city subway system on a finding that reasonable grounds exist for belief that because of his doubtful trust and reliability, his employment endangers the security or defense of the nation and State. He brings this proceeding pursuant to article 78 of the Civil Practice Act to secure his reinstatement.

The petition having been dismissed on the ground that it does not state facts sufficient to entitle appellant to the relief prayed for, we must take the allegations therein contained to be true. These allegations may be summarized as follows: Appellant is a citizen of the United States and a resident of the borough of the Bronx. Respondents are members of the New York City Transit Authority, a public benefit corporation organized pursuant to section 1800 *et seq.* of the Public Authorities Law. It is an agency created by the State performing a governmental function (Public Authorities Law, § 1802) and as such governmental agency is subject to the provisions of the Security Risk Law. Under the provisions of section 1810 of the Public Authorities Law appellant became an employee of the Transit Authority subject to the provisions of the State Civil Service Law. His primary duties consisted of opening and closing subway doors to permit the entrance and exit of passengers together with certain routing duties incidental thereto. His service has at all times been deemed satisfactory and on

one occasion he was awarded a commendation. On September 14, 1954 pursuant to instructions from his immediate supervisor, he appeared at the office of the commissioner of investigation of the City of New York where he was advised by a deputy commissioner that unless he answered all questions fully he would be subject to dismissal. After being sworn, he declined to answer questions concerning his political affiliations, relying upon his constitutional privilege. On two subsequent dates he appeared with counsel and was advised that the Mayor of the City of New York had authorized the commissioner of investigation to inquire into the employment of certain persons in, among other agencies, the Transit Authority. He was again sworn and reiterated his refusal to answer for the reasons stated. On October 21, 1954 he was suspended. The resolution passed by the Transit Authority recited that it had been found, after due investigation and inquiry, that " reasonable grounds exist for belief that, because of his doubtful trust and reliability, the employment of Max Lerner in the position of Conductor would endanger the security or defense of the nation and the state ". It further provided that appellant might within 30 days submit statements or affidavits to show why he should be reinstated or restored to duty. He was informed that the action was taken because he refused to answer questions under oath as to whether he was then a member of the Communist party. His right to submit statements or affidavits within 30 days was pointed out to him. The petition alleges that no charge other than his refusal to answer was made and that for this reason no statements or affidavits were submitted. On November 24, 1954 appellant was discharged by resolution containing a recital similar to the one in the suspension resolution, together with a recital that he had not within the 30-day period communicated with the Transit Authority.

The first question presented is whether the Security Risk Law is to be construed as authorizing the Transit Authority to suspend and discharge appellant merely upon a showing that he invoked his constitutional privilege when asked if he was then a member of the Communist party. Section 5 of said law, unlike some other statutes, makes no specific reference to a refusal to answer.

It cannot be gainsaid that the communist conspiracy is a cancer threatening our nation's existence. As was pointed out in *Matter of Daniman* v. *Board of Educ. of City of N. Y.* (306 N. Y. 532, 540–541, overruled on other grounds in *Slochower* v. *Board of Educ.*, 350 U. S. 551, rehearing denied 351 U. S. 944): " In this court we are all agreed that the Communist party is

a continuing conspiracy against our Government. (See, *Communications Assn.* v. *Douds,* 339 U. S. 382, 425 *et seq.*; *Dennis* v. *United States,* 341 U. S. 494, 564; Preamble to the Feinberg Law [L. 1949, ch. 360, § 1].) We are also all in agreement that an inquiry into past or present membership in the Communist party is an inquiry regarding the official conduct of an officer or employee of the City of New York. Loyalty to our Government goes to the very heart of official conduct in service rendered in all branches of Government. (See N. Y. Const., art. XIII, § 1; Education Law, § 3002; Civil Service Law, §§ 12a, 30; L. 1951, ch. 233, §§ 1, 8.) Communism is opposed to such loyalty. (*Communications Assn.* v. *Douds,* 339 U. S. 382, 425 *et seq., supra*; *Dennis* v. *United States,* 341 U. S. 494, 564, *supra.*) Internal security affects local as well as National Governments.''

It is quite true we may not infer that appellant is a member of the Communist party from his assertion of privilege against self incrimination. On the other hand we are required to, and should, accept as truthful his statement that answers to the questions propounded might have tended to incriminate him. (*Ullmann* v. *United States,* 350 U. S. 422; see *Blau* v. *United States,* 340 U. S. 159.)

In *Garner* v. *Los Angeles Bd.* (341 U. S. 716), the court had before it a provision of the Los Angeles City Charter which provided that no person shall hold or retain public office or employment who advocated the overthrow of the government or was a member of any organization advocating such overthrow. The city by ordinance required the execution of an affidavit by its officers and employees to the effect that they did not advocate the overthrow of the government or belong to any subversive organization. Some employees declined to execute such an affidavit and were discharged for this reason. The court upheld such action, stating (p. 720): '' We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment. The affidavit requirement is valid.'' The above language was quoted with approval in *Adler* v. *Board of Educ.* (342 U. S. 485, 492–493), where the court upheld the constitutionality of the Feinberg Law (Education Law, § 3022).

Justice FRANKFURTER said in his concurring opinion in the *Garner* case (pp. 725–726): "A municipality like Los Angeles ought to be allowed adequate scope in seeking to elicit information about its employees and from them. It would give to the Due Process Clause an unwarranted power of intrusion into local affairs to hold that a city may not require its employees to disclose whether they have been members of the Communist Party or the Communist Political Association. In the context of our time, such membership is sufficiently relevant to effective and dependable government, and to the confidence of the electorate in its government. I think the precise Madison would have been surprised even to hear it suggested that the requirement of this affidavit was an 'Attainder' under Art. I, § 10, of the Constitution. * * * I cannot so regard it."

We apprehend that if a statute, such as the Los Angeles ordinance permitting discharge of a public employee for refusal to execute an affidavit of the character there required, is valid and justifies his discharge for that reason, it is proper for a security agency, charged with the duty of determining whether an employee is of doubtful trust and reliability from a security standpoint, to inquire into those matters and, if the employee refuses to answer, it may not be said that the agency is not empowered to find that such refusal, in and of itself, furnishes reasonable grounds for a belief that he is not a good security risk. It is our view that the correct construction has been placed on the Security Risk Law by the Transit Authority and by the Special Term.

We pass to the problem of constitutionality. Appellant takes exception to the statement of the Special Term that this "statute is presumed to be constitutional and the courts may not declare it unconstitutional unless it is clearly so." It is argued that there is a distinction between cases under the Fourteenth Amendment involving property rights and those cases under that amendment which are tinged with personal rights protected in the First Amendment against an encroachment by the Federal government. The First Amendment reads as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

In *Board of Educ.* v. *Barnette* (319 U. S. 624, 639), the court said: "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles

of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a state to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a ' rational basis ' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case." See, to the same effect, *Thomas* v. *Collins* (323 U. S. 516, 529–530).

*Dennis* v. *United States* (341 U. S. 494), involving the constitutionality of the Smith Act (U. S. Code [1946 ed.], tit. 18, § 11) was clearly a freedom of speech case involving an enactment of Congress. Its validity was upheld. *Gitlow* v. *New York* (268 U. S. 652) involved a New York statute, similar to the Smith Act, making it a crime to advocate the " necessity or propriety of overthrowing * * * organized government by force ". It was held that the test was whether the statute was reasonable, and that it was entirely reasonable for the State to attempt to protect itself from violent overthrow, and the statute was perforce reasonable. *Communications Assn.* v. *Douds* (339 U. S. 382) was decided on the theory that a restriction on freedom of speech in the Federal statute (U. S. Code, tit. 29, § 159, subd. [h]) must pass the " clear and present danger " test. At page 412 it is stated that the First Amendment " requires that one be permitted to advocate what he will unless there is a clear and present danger that a substantial evil will result therefrom." *Schneider* v. *State* (308 U. S. 147) likewise involved a direct restriction on freedom of speech — an ordinance prohibiting distribution of literature and house to house canvassing unless licensed by the police.

On the whole we think the correct interpretation of these cases is that where the rights protected by the First Amendment are involved, closer scrutiny should be accorded to the evil which the Legislature seeks to remedy and a higher degree of care

should be invoked before the courts sustain the validity of legislation impinging on these rights, than in a case where property rights, protected alone by the Fourteenth Amendment, are involved. But this is not to say that there is *no* presumption of constitutionality in a case of the statute duly enacted by a sovereign State. In *Munn* v. *Illinois* (94 U. S. 113, 123) it was stated: '' Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the express will of the legislature should be sustained '' (see, also, *Matter of Fay,* 291 N. Y. 198, 206–207). In short, the stringency of the test to be applied in determining whether the presumption is overcome is in reality the difference between cases involving property rights and those where civil rights are concerned.

Our first inquiry must be whether the subject of the legislation before us is one on which the Legislature is permitted to act. We think the *Garner* and *Adler* cases hereinabove cited. sustaining the validity of the Los Angeles ordinance and of the Feinberg Law, leave no doubt on that score.

We proceed now to examine the question of whether the Security Risk Law bears a real and substantial relation to the permitted objective without unreasonably interfering with personal rights. Appellant's principal reliance is on *Anti-Fascist Committee* v. *McGrath* (341 U. S. 123) and *Wieman* v. *Updegraff* (344 U. S. 183). In the *Wieman* case an Oklahoma statute, requiring State officers and employees to take a loyalty oath stating, among other things, that they had not been for the preceding five years a member of any organization listed by the United States Attorney General as '' a Communist front '' or '' subversive '', had been construed by the State court as excluding persons from employment solely on the basis of membership in such organizations irrespective of their knowledge of the activities and aims of the groups to which they had belonged. The court held that as so construed the statute was violative of the due process clause of the Fourteenth Amendment, which does not permit a State to classify innocent with knowing association. The court stated (p. 191): '' Indiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power.'' The court at pages 188–189 distinguished the *Garner* and *Adler* cases hereinabove referred to, on the ground that in the former *scienter* was implicit in each clause of the oath, and in the latter, as the court pointed out, '' we expressly noted that the New York courts had construed the statute to require knowledge of organizational purpose before the regulation could apply.''

The *Anti-Fascist Committee* case involved a situation where the United States Attorney General had listed certain organizations as communist *without notice or hearing*. These organizations sued for declaratory judgments and for injunctive relief. The lower courts granted motions to dismiss the complaints for failure to state claims upon which relief could be granted. The judgments were reversed and the cases remanded for instructions to deny the motions. Section 8 of the Security Risk Law specifically provides that the designation of an organization as subversive must have been made after notice, and appropriate hearing.

Recent authoritative word on the subject is *Slochower* v. *Board of Educ.* (350 U. S. 551, *supra*). The New York Court of Appeals had held section 903 of the New York City Charter to be constitutional and applicable to refusal to answer questions concerning communist affiliations. (*Matter of Daniman* v. *Board of Educ. of City of N. Y.*, 306 N. Y. 532, *supra*.) In the *Slochower* case the court held that statute to be invalid, at least in part, as violative of the due process clause of the Fourteenth Amendment. All the court actually decided was that a city college teacher, who was entitled to tenure and who could be discharged only for cause after notice, hearing and appeal under the provisions of subdivisions 2 and 10 of section 6206 of the Education Law, could not be mandatorily and summarily dismissed for invoking the Fifth Amendment before a congressional committee conducting an inquiry *not* directed at the property, affairs or government of the city or the official conduct of city employees. The statutory provisions, as well as the facts, are clearly distinguishable. Section 903 of the charter apparently renders obligatory the discharge, without notice or hearing of any kind, of an employee who " shall, after lawful notice or process, wilfully refuse or fail to appear before any court or judge, any legislative committee, or any officer, board or body authorized to conduct any hearing or inquiry, or having appeared shall refuse to testify or to answer any question regarding the property, government or affairs of the city or of any county included within its territorial limits " and for like summary removal for refusal to waive immunity upon any such hearing or inquiry. The opinion of the court concludes with this language (pp. 558–559): " we consider the application of § 903. As interpreted and applied by the state courts, it operates to discharge every city employee who invokes the Fifth Amendment. In practical effect the questions asked are taken as confessed and made the basis of the discharge. No consideration is given to such factors as the subject matter of

the questions, remoteness of the period to which they are directed, or justification for exercise of the privilege. It matters not whether the plea resulted from mistake, inadvertence or legal advice conscientiously given, whether wisely or unwisely. The heavy hand of the statute falls alike on all who exercise their constitutional privilege, the full enjoyment of which every person is entitled to receive. Such action falls squarely within the prohibition of *Wieman* v. *Updegraff* (*supra*).

" It is one thing for the city authorities themselves to inquire into Slochower's fitness but quite another for his discharge to be based entirely on events occurring before a federal committee whose inquiry was announced as not directed at ' the property, affairs, or government of the city, or * * * official conduct of city employees.' In this respect the present case differs materially from *Garner,* where the city was attempting to elicit information necessary to determine the qualifications of its employees. Here, the Board had possessed the pertinent information for 12 years, and the questions which Professor Slochower refused to answer were admittedly asked for a purpose wholly unrelated to his college functions. On such a record the Board cannot claim that its action was part of a bona fide attempt to gain needed and relevant information.

\* \* \*

" This is not to say that Slochower had a constitutional right to be an associate professor of German at Brooklyn College. The State has broad powers in the selection and discharge of its employees, and it may be that proper inquiry would show Slochower's continued employment to be inconsistent with a real interest in the State. But there has been no such inquiry here. We hold that the summary dismissal of appellant violates due process of law." We apprehend that in view of the manner in which the court stressed the " remoteness of the period to which they [the questions] are directed," the failure of the statute to provide an opportunity to explain the reason for refusal to answer and, more particularly, the nature of the inquiry being conducted by the Federal committee, that decision must be strictly limited to its own peculiar facts. The reference to the *Garner* case is some indication that, had Professor Slochower's refusal to answer occurred before a duly constituted body investigating the affairs of the board of higher education or of Brooklyn College, a different result would have been reached even under section 903 of the charter.

In the instant case, appellant's testimony was sought in a duly authorized inquiry by the commissioner of investigation

into the affairs of the Transit Authority. He declined on three separate occasions to answer questions concerning his *present* membership in the Communist party. He was thereupon suspended, given notice and afforded, in accordance with the statute, an opportunity to explain his conduct. He proffered no explanation, nor did he avail himself of his right to an appeal and to a full hearing before the State Civil Service Commission.

It is true that in the *Slochower* case the court stated: " At the outset we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment." (350 U. S. 551, 557, *supra*.) But the court cited *Ullmann* v. *United States* (350 U. S. 422, *supra*), which upheld the validity of the Immunity Act of 1954 (U. S. Code, tit. 18, § 3486). The determination in the *Slochower* case fortifies the conclusion that we are required to, and should, accept as truthful appellant's claim that truthful answers to the questions propounded might have tended to incriminate him. The court, in the *Ullmann* case, cited and reaffirmed *Brown* v. *Walker* (161 U. S. 591), stating (p. 439): " Immunity displaces the danger. Once the reason for the privilege ceases, the privilege ceases."

We see little similarity between the *Wieman, Anti-Fascist Committee,* and *Slochower* cases and the one before us. We are not here concerned with an arbitrary exclusion of an employee irrespective of his guilty knowledge or intent, remoteness of time or mistake or inadvertence, but with a finding, after an opportunity to submit a statement or affidavits and an opportunity to appeal to the State Civil Service Commission, that reasonable grounds exist for belief that because of doubtful trust or reliability he constitutes a security risk. Nor do we regard the determination in *Cole* v. *Young* (351 U. S. 536) as indicating a different conclusion. The statute there construed is the so-called Federal Security Risk Law of 1950 (U. S. Code, tit. 5, § 22-1). The court pointed out (pp. 541-542): " The Act was expressly made applicable only to the Departments of State, Commerce, Justice, Defense, Army, Navy, and Air Force, the Coast Guard, the Atomic Energy Commission, the National Security Resources Board, and the National Advisory Committee for Aeronautics. Section 3 of the Act provides, however, that the Act may be extended ' to such other departments and agencies of the Government as the President may, from time to time, deem necessary in the best interests of national security,' and the President has extended the Act under this authority ' to all other departments and agencies of the Government.' " The court held (p. 543): " (1) that the term ' national security '

is used in the Act in a definite and limited sense and relates only to those activities which are directly concerned with the Nation's safety, as distinguished from the general welfare; and (2) that no determination has been made that petitioner's position was affected with the ' national security ' as that term is used in the Act '', and that the dismissal there was accordingly not authorized by the act. It was further stated (p. 557): " In reaching this conclusion, we are not confronted with the problem of reviewing the Secretary's exercise of discretion, since the basis for our decision is simply that the standard prescribed by the Executive Order and applied by the Secretary is not in conformity with the Act." In reaching this conclusion as to the congressional intent, the court reasoned as follows (pp. 544–545): " Virtually conclusive of this narrow meaning of ' national security ' is the fact that, had Congress intended the term in a sense broad enough to include all activities of the Government, it would have granted the power to terminate employment ' in the interest of the national security ' to all agencies of the Government. Instead, Congress specified 11 named agencies to which the Act should apply, the character of which reveals, without doubt, a purpose to single out those agencies which are directly concerned with the national defense and which have custody over information the compromise of which might endanger the country's security, the so-called ' sensitive ' agencies. Thus, of the 11 named agencies, 8 are concerned with military operations or weapons development, and the other 3, with international relations, internal security, and the stock-piling of strategic materials. Nor is this conclusion vitiated by the grant of authority to the President, in § 3 of the Act, to extend the Act to such other agencies as he ' may, from time to time, deem necessary in the best interests of national security.' Rather, the character of the named agencies indicates the character of the determination required to be made to effect such an extension. Aware of the difficulties of attempting an exclusive enumeration and of the undesirability of a rigid classification in the face of changing circumstances, Congress simply enumerated those agencies which it determined to be affected with the ' national security ' and authorized the President, by making a similar determination, to add any other agencies which were, or became, ' sensitive.' That it was contemplated that this power would be exercised ' from time to time ' confirms the purpose to allow for changing circumstances and to require a selective judgment, necessarily implying that the standard to be applied is a less than all-inclusive one."

All this is clearly distinguishable from the situation in the

case at bar, where, as has been pointed out, the statute specifically requires the State Civil Service Commission to make a determination, reviewable by the courts, that the agency or position is in fact one which affects the security of the State or nation.

Irrespective of the propriety of regarding the mere invoking of the privilege against self incrimination (which might be considered by some a technicality, although others would regard it of considerable substance) as constituting a justification for a finding of doubtful trust and reliability, we feel that the Transit Authority's conclusion was indeed warranted when appellant declined to state, on whatever grounds, whether he was a member of a conspiracy dedicated to the forcible overthrow of our government, refused to explain such declination, and failed to take advantage of an opportunity to be heard on the subject.

While the State may not arbitrarily and capriciously bar a person from public employment, nonetheless a person does not have an unqualified right to work for the State on his own terms; the State may impose reasonable terms. As the court said in *Adler* v. *Board of Educ.* (342 U. S. 485, 492, *supra*): "If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere. Has the State thus deprived them of any right to free speech or assembly? We think not."

With respect to the contention that procedural due process was denied appellant because he was not accorded the rights provided in section 22 of the Civil Service Law governing the procedure to be followed in the removal of civil service employees for misconduct or incompetency, it is necessary only to point out that the last sentence of subdivision 3 of said section provides: "Nothing herein contained shall be construed to repeal or modify any general, special, local law or charter provision relating to the removal or suspension of officers or employees in the competitive class of the civil service of the state or any city or any civil division." (See *Matter of Ryan* v. *Hand,* 258 App. Div. 912; *Matter of Skinkle,* 249 N. Y. 172; *Matter of Gray* v. *Spears,* 206 Misc. 1020.) Section 22 must be held to be inapplicable here. Had appellant availed himself of his right to appeal to the civil service commission, it may well be that rather than being discharged he would have been transferred to a nonsecurity position or agency.

The order should be affirmed, with $50 costs and disbursements.

BELDOCK, J. (dissenting). On October 21, 1954 appellant was suspended, and on November 24, 1954 discharged, by the New York City Transit Authority from his position as a subway conductor. His duties consisted primarily of opening and closing subway doors to permit the entrance and exit of passengers. The ground for the action of the Transit Authority was that appellant held a position in a security agency, and that reasonable grounds existed for belief that, by reason of doubtful trust and reliability, his continued employment would endanger the security or defense of the United States and of New York State. The latter finding was based solely on evidence that appellant had invoked the constitutional privilege against self incrimination when questioned by the New York city department of investigation concerning his past or present membership in the Communist party. The action was taken pursuant to the purported authority of the Security Risk Law.

In my opinion, appellant's suspension and discharge were illegal for three reasons: (1) the Security Risk Law is inapplicable to employees of the New York City Transit Authority because its employees are not in the service of the State or of any civil division thereof; (2) even if the Security Risk Law is applicable to employees of the Transit Authority, it is inapplicable to appellant because he did not hold a security position therein or a sensitive position affected with the security or defense of the nation or the State, and (3) neither suspension nor discharge is authorized under the Security Risk Law where the assertion of the constitutional privilege against self incrimination is the only evidence of doubtful trust and reliability endangering the security or defense of the nation and the State.

The New York City Transit Authority was created by the Legislature as a " body corporate and politic constituting a public benefit corporation." (Public Authorities Law, § 1801, subd. 1.) It was established as a separate entity because of the administrative and fiscal advantages attained by the separation of its functions from the general administrative machinery of the State and its civil divisions (1929 Atty. Gen. 223) and to insulate the State from liability in the performance of a specific public service. Despite the fact that the Transit Authority is a corporate agent and instrumentality of the State in the discharge of a governmental function (1949 Atty. Gen. 138; Public Authorities Law, § 1802, subd. 2), its employees are *not* employees of the State or of any of its civil divisions. (1951 Atty. Gen. 152.) The Security Risk Law (L: 1951. ch. 233) applies by its terms only to persons in " governmental service " (§§ 1, 4), i.e., in the service of the State or of any

of its civil divisions (§§ 3, 5). Since appellant, as an employee of the Transit Authority, was not in the service of the State or of any civil division thereof, he was not encompassed by the Security Risk Law. Therefore, his suspension and subsequent discharge pursuant to that law were illegal.

However, even assuming that the Security Risk Law was applicable to employees of the Transit Authority, it was not applicable to appellant because there is no finding that he held either a security position or a sensitive position affected with the security or defense of the nation or State. The basic language of the State law under consideration was adopted from language used with respect to Federal agencies. (See Public Papers of Gov. Thomas E. Dewey [1951], p. 291.) The Supreme Court has recently held (*Cole* v. *Young*, 351 U. S. 536) that the Federal Security Risk Law (U. S. Code, tit. 5, § 22-1) does not apply to all positions in security agencies, but only to security positions therein. The court limited the use of the term "national security", as used in that law, to comprehend only those activities of the government directly concerned with the protection of the nation from internal subversion or foreign aggression, and found that activities which contribute to the strength of the nation only through their impact on the general welfare were not included therein. The court specifically held that the summary procedure for suspension and discharge authorized therein is available only with respect to an employee in a sensitive position or to one situated where he can bring about a discernible effect on the nation's security, i.e., to employees whose position is affected with, and whose misconduct would adversely affect, the national security. The State law presently under consideration, patterned on the similar Federal law, should be given the same interpretation. In the case at bar, although there is a finding that appellant's employment in the position of conductor endangers the security or defense of the nation and State, similar to the general finding in *Cole* v. *Young* (*supra*), there is absent the finding which the Supreme Court held a necessary requisite to suspension or discharge under the Federal law, to wit, that appellant's position as conductor was one in the category to which the Security Risk Law is limited. The opinion indicated that the latter finding might be based on evidence that the position was sensitive because the employee had access to governmental secrets or classified material, or that he was in a position to influence policy against the interests of the government. Without that necessary finding here, the suspension and discharge were invalid.

Finally, there was no proof that appellant was a security risk within the provisions of the statute. The essence of the majority opinion is that, accepting as truthful appellant's statement that answers to questions as to his past or present membership in the Communist party might have tended to incriminate him, such refusal to answer, standing alone, gives reasonable ground to believe that appellant is of doubtful trust and reliability and thereby his continued employment as a subway conductor endangers the security or defense of the United States and New York State. It is precisely that inference of guilt from the truthful assertion of the same privilege in answer to the same questions which was repudiated by the Supreme Court in *Slochower* v. *Board of Educ.* (350 U. S. 551, 557) when it said: "we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment. * * * The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury."

The Security Risk Law does not provide that a refusal to answer questions concerning membership in the Communist party, or the assertion of a constitutional privilege, when asked such questions, is sufficient ground for suspension or discharge. On the contrary, section 7 thereof seems to require *affirmative* evidence of wrongful conduct on the part of the employee to support a finding under either section 4 or section 5. Section 7 provides that a finding under section 4 or section 5 may be based on membership in a subversive organization. Unless the statute is construed to mean guilty rather than innocent membership, it would be invalid. (*Wieman* v. *Updegraff*, 344 U. S. 183; *Garner* v. *Los Angeles Bd.*, 341 U. S. 716.) Yet, although the constitutional privilege serves to protect persons innocent of any wrongdoing whatever (*Slochower* v. *Board of Educ.*, 350 U. S. 551, *supra*), and although no inference of membership in the Communist party may be drawn from the assertion of the privilege (*Matter of Daniman* v. *Board of Educ. of City of N. Y.*, 306 N. Y. 532, 538), the majority holds that appellant was properly suspended and discharged, whether or not he was a member of the Communist party, and whether he was an innocent or guilty member thereof. The mere exercise of the constitutional privilege has now become the basis for suspension and discharge under the statute, quite apart from an inference of guilt. In my opinion, such a determination not only departs from established authority, but permits the court to set as a criterion that which the Legislature has not done, namely, to

make the assertion of the privilege a test of endangering the security or defense of the nation and the State. In the *Slochower* case it was held that a State violates due process when it makes a claim of privilege ground for discharge. Yet here, where the statute does not provide what the statute there expressly provided, the Transit Authority has nevertheless made the claim of privilege ground for suspension and discharge, and the majority has approved that action. I am unable to concur in such a determination.

The order should be reversed and the appellant should be reinstated.

NOLAN, P. J., MURPHY and KLEINFELD, JJ., concur with UGHETTA, J.; BELDOCK, J., dissents and votes to reverse the order and to reinstate appellant, in opinion.

Order affirmed, with $50 costs and disbursements.